**Derrick Bernard ALLEN, Appellant,**

v.

**The STATE of Texas, State.**

**No. 2–02–309–CR.**

Court of Appeals of Texas,
Fort Worth.

Sept. 2, 2004.

Rehearing Overruled Sept. 30, 2004.

Dean Swanda, Swanda & Swanda, P.C., Arlington, TX, for Appellant.

Tim Curry, Criminal District Attorney, Charles M. Mallin, Steven W. Conder, Jay Lapham and Michael Parrish, Asst. Criminal District Attys., Fort Worth, TX, for Appellee.

Panel F: DAUPHINOT, LIVINGSTON, and McCOY, JJ.

## OPINION

PER CURIAM.

A jury convicted Appellant Derrick Bernard Allen of capital murder and, because the State did not seek the death penalty, the trial court sentenced Appellant to life imprisonment in the Institutional Division of the Texas Department of Criminal Justice. Appellant raises five issues on appeal, arguing that the evidence is legally and factually insufficient to support his conviction, the standard of review for factual sufficiency should be abrogated, the trial court allowed improper commitment questions during voir dire, and the trial court erred by overruling Appellant's objections that the prosecutor struck at Appellant over the shoulders of trial counsel in final argument. Because we hold that the evidence is legally and factually sufficient and that the trial court's error in allowing the State's improper argument is not reversible, we affirm the trial court's judgment.

### FACTUAL BACKGROUND

On January 2, 2001, Timothy was a thirty-seven-month-old child with cerebral palsy. He could neither speak nor walk, but he could cry and he could crawl. He would often become constipated and cry. Timothy lived in an apartment in Fort Worth, with his mother Trevina Scott, his five-year-old brother Cameron, and Appellant, his mother's boyfriend.

When Trevina Scott bathed Timothy on the morning of January 2, 2001, she did not notice any marks or bruises on his body. She spent the day at the apartment with the two children. Appellant returned to the apartment around 7:00 p.m. Trevina Scott fed Timothy between 7:30 and 8:00 p.m., and, according to her, Timothy was not complaining or upset about anything at that time. She put Timothy to bed around 8:00 p.m. At approximately 9:00 p.m., Trevina Scott's cousin Schlenski Boney, and Laditria Johnson, Trevina Scott's friend, arrived at the apartment. As Laditria Johnson walked into the bathroom, she noticed Timothy in his room crying softly because he was trying to have a bowel movement. Schlenski Boney later went into the bedroom where Timothy was located to make a telephone call. Timothy was not crying at that time, but he was awake and alert. Trevina Scott called her grandmother, Mama Vera, at about 10:00 p.m. to see if she still had any left-over New Year's Day food. Trevina Scott, Schlenski Boney, and Laditria Johnson left for Mama Vera's house between 10:00 and 10:15 p.m. Trevina Scott left Timothy and Cameron in Appellant's care. Trevina Scott did not check on Timothy before leaving, but testified that he had no bruises before she left the apartment. To Trevina Scott's knowledge, Appellant was the

only adult in the apartment while she was away. The women stayed at Mama Vera's for twenty to twenty-five minutes and no more than thirty minutes.

Meanwhile, at 10:52 p.m., paramedic Paul Weis received a priority one call regarding a child having difficulty breathing. When Weis arrived at Trevina Scott's apartment, Appellant greeted him and told him that Timothy had a cold and was having trouble breathing. Weis checked Timothy and determined that his hands were cold, his lips were blue, and his breathing was labored. Weis began preparing to take Timothy to the hospital.

When the women arrived back at the apartment, the ambulance was still there. Appellant told Trevina Scott that Timothy had started throwing up some thick white stuff and then his lips "turned color."

Trevina Scott went with Timothy in the ambulance to the hospital. At Cooks Children's Hospital, Timothy was placed in a special oxygen room. Although he was conscious and alert, he had difficulty breathing and no detectable pulse. Doctor Kimberly Aaron, the treating pediatric physician, testified that Timothy's lack of a pulse was not related to his cerebral palsy. Trevina Scott testified that she was told to call Appellant to find out what had happened to Timothy. When Trevina Scott called Appellant, he told her that Timothy was choking and spitting up. Appellant said he gave Timothy some pickle juice in his bottle and that he started turning blue, so Appellant called 911. Trevina Scott denied that anyone had told them to give Timothy pickle juice or that she had ever given pickle juice to the child in the past. Appellant did not claim that Timothy had fallen. Trevina Scott testified that she made the telephone call from the same room in the hospital in which the medical personnel were treating Timothy.

Doctor Aaron determined that Timothy was losing blood from an organ in his belly. His condition deteriorated, and Doctor Aaron pronounced him dead at 1:57 a.m. on January 3, 2001.

Doctor Aaron identified State's exhibits numbers nineteen, twenty, and twenty-two as photographs of Timothy on January 3, 2001, at the end of the resuscitation efforts. She testified that the patten of bruising visible in State's exhibit twenty-two was "very characteristic for a bruising pattern that occurs in a child who is punched with a fist." She also testified that Timothy had rib fractures and that they were particularly significant because a child's ribs are very pliable; thus, the amount of force required to break a child's rib is massive. A child could fall out of a second story window, she said, and not have a break. The reason the broken ribs were significant was that a child could suffer massive internal organ injuries to the heart, lungs, spleen, and liver even without having a rib fracture because the ribs will compress when hit and the underlying organs will be damaged. She denied that the fractured ribs were caused by the resuscitation efforts.

When Trevina Scott told Appellant that Timothy had died, Appellant started screaming. When Trevina Scott told Appellant that the police believed he had something to do with Timothy's death, Appellant began shaking.

The autopsy showed that Timothy had a healed rib fracture, recent rib fractures, and multiple liver lacerations. The cause of death was determined to be acute massive bleeding due to the liver lacerations and an abdominal blunt-force injury.

## LEGAL SUFFICIENCY

Appellant argues that the evidence is legally insufficient to support his conviction because the indictment alleges that

Appellant struck the complainant with or against an object unknown to the grand jury, but that there was no testimony regarding what the grand jury determined or attempted to determine regarding the means of death.

The State argues that, since the Texas Court of Criminal Appeals handed down *Gollihar v. State*,[1] the rule requiring the State to show that the grand jury exercised due diligence in determining the instrumentality of the defense is no longer relevant to a reviewing court's analysis of legal sufficiency of the evidence. At least two of our sister courts have held that the due diligence inquiry is not an essential element of the offense, relying on *Gollihar*.[2] Pre-*Gollihar* case law provided, if the evidence at trial fails to establish what instrument or weapon was used, a prima facie showing is made that the instrument or weapon was unknown to the grand jury.[3]

In the case now before this court, Dr. Nizam Peerwani, Tarrant County Medical Examiner, testified that he could not be certain of the instrumentality of death. Dr. Aaron testified that while the rib fractures were consistent with being punched, it was also possible that the bruises were caused by being slammed up against an object. Former police officer Leyden Anderson testified that he thought the complainant's fatal injuries were caused by a punch, although he was not completely certain. No witness testified with certainty of the instrumentality of death. Consequently, even under prior case law, the State would not be required to show the grand jury exercised due diligence in seeking the instrumentality of death.[4]

No witness testified with certainty regarding the instrumentality of death. There was no variance, therefore, between the proof at trial and the charging instrument, which alleged death was caused by an instrument unknown to the grand jury. We hold that the evidence is legally sufficient to support the jury's verdict. We overrule Appellant's first issue.

## Factual Sufficiency

In his fifth issue, Appellant argues that the standard of review for factual sufficiency challenges in effect at the time he filed his brief is more demanding than the standard of review for legal sufficiency challenges. He also argues for the abrogation of the standard in favor of a standard less demanding than the legal sufficiency challenge. The Court of Criminal Appeals recently clarified the factual sufficiency standard in *Zuniga v. State*.[5] We leave it to that court to adopt a new standard. We overrule Appellant's fifth issue.

In his fourth issue, Appellant argues that the evidence is factually insufficient to support the jury's verdict. In reviewing the factual sufficiency of the evidence to support a conviction, we are to view all the evidence in a neutral light, favoring neither party.[6] The only question to be an-

1. 46 S.W.3d 243 (Tex.Crim.App.2001).

2. *See, e.g., In re A.J.G.*, 131 S.W.3d 687, 694 (Tex.App.-Corpus Christi 2004, pet. denied); *Richards v. State*, 54 S.W.3d 348, 350 (Tex. App.-Houston [1st Dist.] 2001, pet. ref'd).

3. *Rosales v. State*, 4 S.W.3d 228, 231 (Tex. Crim.App.1999); *Hicks v. State*, 860 S.W.2d 419, 424 (Tex.Crim.App.1993), *cert. denied*, 512 U.S. 1227, 114 S.Ct. 2725, 129 L.Ed.2d 848 (1994); *Matson v. State*, 819 S.W.2d 839, 847 (Tex.Crim.App.1991).

4. *Tidrow v. State*, 916 S.W.2d 623, 630 (Tex. App.-Fort Worth 1996, no writ); *Hicks*, 860 S.W.2d at 424.

5. 144 S.W.3d 477, 481–86 (Tex.Crim.App. 2004).

6. *Id.*

swered in a factual sufficiency review is whether, considering the evidence in a neutral light, the fact finder was rationally justified in finding guilt beyond a reasonable doubt.[7] There are two ways evidence may be factually insufficient: (1) the evidence supporting the verdict or judgment, considered by itself, is too weak to support the finding of guilt beyond a reasonable doubt; or (2) when there is evidence both supporting and contradicting the verdict or judgment, weighing all of the evidence, the contrary evidence is so strong that guilt cannot be proven beyond a reasonable doubt.[8] "This standard acknowledges that evidence of guilt can 'preponderate' in favor of conviction but still be insufficient to prove the elements of the crime beyond a reasonable doubt." [9] In other words, evidence supporting a guilty finding can outweigh the contrary proof but still be insufficient to prove the elements of an offense beyond a reasonable doubt.[10] In performing a factual sufficiency review, we are to give deference to the fact finder's determinations, including determinations involving the credibility and demeanor of witnesses.[11] We may not substitute our judgment for that of the fact finder's.[12]

■ A proper factual sufficiency review requires an examination of all the evidence.[13] An opinion addressing factual sufficiency must include a discussion of the most important and relevant evidence that supports the appellant's complaint on appeal.[14]

Appellant traces the timeline for the events of the night the complainant was injured. Appellant called 911 at 10:52 p.m. Dr. Aaron thought Timothy would have become symptomatic ten or fifteen minutes after receiving his injuries. Dr. Peerwani thought the complainant would have become symptomatic approximately thirty minutes after receiving his injuries. If Dr. Peerwani's testimony, which is more favorable to Appellant, is taken as true, and if Appellant called 911 as soon as the complainant became symptomatic, the injury occurred around 10:22 p.m. Trevina's Scott's testimony indicated that she left for Mama Vera's house between 10:10 and 10:15 p.m. Trevina Scott returned home at approximately 11:20 p.m., having left Mama Vera's around 11:09 p.m. But Appellant argues that Trevina Scott, her cousin, and her friend must have been present when the complainant sustained the injury that caused his death.

Additionally, Dr. Peerwani testified that the complainant had an old broken rib dating from a minimum of one to two months to approximately a year earlier. Appellant argues that because Trevina Scott had known Appellant only eight or nine months, there was a reasonable chance that the complainant had suffered the broken rib before Appellant came into Trevina Scott's life. Appellant also argues that Trevina Scott was hostile toward CPS because she had reason to fear CPS. Additionally, he argues that Schlenski Boney and Laditria Johnson had no loyalty to-

7. *Id.* at 484.

8. *Id.*

9. *Id.*

10. *Id.*

11. *Id.* at 4814; *Cain v. State,* 958 S.W.2d 404, 407 (Tex.Crim.App.1997).

12. *Zuniga* at 481.

13. *Id.* at 484, 486.

14. *Sims v. State,* 99 S.W.3d 600, 603 (Tex. Crim.App.2003).

ward Appellant and might fear indictment if they sided with Appellant.

Appellant argues that, viewing the evidence in a neutral light, there is a reasonable doubt that Trevina Scott, Laditria Johnson, and Schlenski Boney were all present when the complainant was injured. He argues that his conviction and Trevina Scott's exoneration both rest squarely on the testimony of Trevina Scott, Laditria Johnson, and Schlenski Boney. Consequently, he argues, a rational juror would retain a reasonable doubt about their credibility. We defer to the jury's determinations about the credibility of the witnesses.[15] Based on our review of the evidence detailed above under the appropriate standard of review, we hold that the evidence is factually sufficient to support the jury's verdict. We overrule Appellant's fourth issue.

## COMMITMENT QUESTIONS ON VOIR DIRE

■ In his second issue, Appellant argues that the trial court improperly allowed the State to ask and receive responses to a lengthy series of improper commitment questions. The series of questions to which Appellant objected at trial and of which he complains of on appeal dealt with venire members' attitudes toward circumstantial evidence. Specifically, the prosecutor asked whether the venire members would refuse to convict a person of capital murder when the evidence was circumstantial.

Appellant argues that the prosecutor's questions asked for a commitment from the venire members. The questions did not ask the venire panel to commit to convicting based on circumstantial evidence. The questions sought to ferret out biases against the law that allows conviction based on circumstantial evidence.[16] That is, as phrased, the questions did not ask the jury panel to promise to convict based on circumstantial evidence. They asked whether the jury would refuse to convict based on circumstantial evidence. While the state of the law on commitment questions is conflicting at best,[17] we hold that the State's questions properly inquired into a bias against a portion of the law upon which the State is entitled to rely. The trial court therefore did not abuse its discretion in overruling Appellant's objections. We overrule Appellant's second issue.

## JURY ARGUMENT

In his third issue, Appellant argues that the trial court reversibly erred by overruling his objection that the prosecutor struck at Appellant over the shoulder of his trial counsel when, during final argument, the prosecutor stated that he was appalled and disgusted with defense counsel and claimed that defense counsel had argued that the offense should be excused because the complainant was worthless.

The State contends that the argument was an appropriate response to Appellant's

15. *Zuniga* at 481; *Cain*, 958 S.W.2d at 407.

16. *See Burden v. State*, 55 S.W.3d 608, 613 (Tex.Crim.App.2001) (providing that standard of review for sufficiency of evidence is same for direct and circumstantial cases); *Kutzner v. State*, 994 S.W.2d 180, 184 (Tex.Crim.App. 1999) (providing same).

17. *See Standefer v. State*, 59 S.W.3d 177, 182 (Tex.Crim.App.2001) ("To be proper, ... a

commitment question must contain *only* those facts necessary to test whether a prospective juror is challengeable for cause."); *Lydia v. State*, 117 S.W.3d 902, 906–13 (Tex.App.-Fort Worth 2003, pet. ref'd) (op. on remand) (Dauphinot, J., concurring) ("A mere inquiry into a veniremember's thoughts and opinions is not an attempt to commit that veniremember.").

jury argument. The relevant portions of the arguments are:

[DEFENSE CO–COUNSEL]: We have a very—this is an incredibly tragic situation. This kid—

[PROSECUTOR]: I object to the reference of "this kid." It can be the victim, it can be his name, but I object to that.

[DEFENSE CO–COUNSEL]: They call my client dirty and Brown and everything else.

THE COURT: Overruled. Go ahead.

[DEFENSE CO–COUNSEL]: This child—whatever [the prosecutor] wants me to call him. This child, I wouldn't want to wish his life on anybody. He was born into a situation where he was never going to have a good quality of life. He had it all against him from the start.

And his life was tragically ended, and it was ended by somebody. We are not going to tell you it was an accident or the doctors did it. But it would be just as much of a tragedy to lock up the wrong guy for it.

And if you conscientiously apply the burden of proof and you look at the evidence, there are many reasons to doubt the State's case. And in that situation you have to vote not guilty.

The prosecutor then made the following arguments in closing:

[PROSECUTOR]: Ladies and gentlemen, this kid, this kid, the reason why we are here, his name is Timothy. . . . . He was a member of our community. He was not garbage. He was not a throw-away kid as [defense counsel] suggests.

He had the right to live in our community. He had the right to be loved by his mother. He's not garbage. His name is Timothy. And Timothy is not here with us anymore.

And ladies and gentlemen, I am appalled and quite frankly I am disgusted that [defense counsel] would get up here and stand up here—

[DEFENSE CO–COUNSEL]: Your Honor, object to counsel's striking at the Defendant over the shoulder of counsel.

THE COURT: Overruled.

[PROSECUTOR]: That because someone is born to poverty, that Trevina Scott was flat broke, she's unworthy to have a child; that she doesn't deserve to have a child; that if you don't have enough money, if you don't wear a suit, then you don't get to have a child.

I guess [defense counsel] are the only people that deserve to have children in this community. Is that what we say? Is that the way it works? In China where you are limited to two children, is that the society we have become? You are not worthy because you can't have a job.

. . . .

[PROSECUTOR]: Did [Appellant] do it or did [Trevina Scott] do it? The evidence is clear that the [Appellant] did it. The defense attorney said, well, he was just Timothy. He wasn't going to amount to much. He was just a throw-away kid. He doesn't deserve justice.

[DEFENSE COUNSEL]: Again, Your Honor, renew my objection. That's not what the defense attorney said. That's striking at the Defendant over the shoulder of counsel.

THE COURT: Overruled.

[PROSECUTOR]: Timothy deserved justice just as much as anybody else in our community. If you should find the Defendant not guilty, you are telling me, the district attorney's office, the Crimes Against Children Unit, the detectives,

the police, don't investigate any case involving special-needs children. They are not worthy of protection. They don't deserve it.

You are also telling us that a circumstantial case—in other words, a case where there isn't a confession, where there isn't an eyewitness to the beating, shouldn't be investigated, shouldn't be prosecuted because we can never, ever, ever tell who committed the crime.

That's what a not guilty verdict would tell us, tell the community. Is that the message that you want to send in the face of this evidence that's so strong, so clear that that man, as [the prosecutor] called him—because that's what he is, Derrick Brown, Derrick Allen, Dirty, took Timothy's life unmercifully on January 2.

THE COURT: Two minutes.

[PROSECUTOR]: Show Timothy justice. He deserves it. The Defendant committed this despicable crime. Hold him accountable based on the evidence. Find him guilty of capital murder. Thank you.

 The prosecutor clearly mischaracterized Appellant's jury argument, improperly expressed his personal opinion regarding defense counsel's arguments not objected to, and engaged in improper, unprovoked personal attacks on both defense counsel. Consequently, the trial court's overruling of Appellant's objections to the attack on defense counsel during jury argument is error because the argument was not relevant, it injected personal opinion, and it violated the Texas Lawyers Creed.[18] Although we in no way condone the prosecutor's argument, the error is nonconstitutional.[19] It is therefore not reversible unless it affected Appellant's substantial rights.[20] The error did not affect Appellant's substantial rights at the guilt-innocence stage because the evidence of Appellant's guilt was ample.[21] Similarly, because the sentence was automatically ascertained as a matter of law, the error did not affect punishment. We are therefore compelled to hold that the improper argument does not constitute reversible error. We can only hope that this result does not encourage such conduct by attorneys on either side of the bar. We overrule Appellant's third issue.

### CONCLUSION

Having overruled Appellant's issues, we affirm the trial court's judgment.

LIVINGSTON, J. concurs without opinion.

McCOY, J. concurs without opinion.

---

18. *See Wilson v. State,* 938 S.W.2d 57, 60–61 (Tex.Crim.App.1996), *abrogated on other grounds by Motilla v. State,* 78 S.W.3d 352 (Tex.Crim.App.2002); *Felder v. State,* 848 S.W.2d 85, 94–95 (Tex.Crim.App.1992), *cert. denied,* 510 U.S. 829, 114 S.Ct. 95, 126 L.Ed.2d 62 (1993); *Alejandro v. State,* 493 S.W.2d 230, 231 (Tex.Crim.App.1973); Texas Lawyer's Creed–A Mandate for Professionalism-"Order of Adoption," 783 S.W.2d XXXIII.

19. *See Mosley v. State,* 983 S.W.2d 249, 259 (Tex.Crim.App.1998) (op. on reh'g), *cert. denied,* 526 U.S. 1070, 119 S.Ct. 1466, 143 L.Ed.2d 550 (1999).

20. *See* Tex.R.App. P. 44.2(b); *Martinez v. State,* 17 S.W.3d 677, 692–93 (Tex.Crim.App.2000); *Mosley,* 983 S.W.2d at 259.

21. *See Martinez,* 17 S.W.3d at 692–93; *Mosley,* 983 S.W.2d at 259.