AP-77,025
COURT OF CRIMINAL APPEALS
AUSTIN, TEXAS
Transmitted 4/15/2015 12:03:53 PM
Accepted 4/15/2015 12:37:33 PM
ABEL ACOSTA
CLERK

No. AP-77,025

In the
Texas Court of Criminal Appeals
At Austin

———————◆———————

No. 1384794
In the 337th District Court
Of Harris County, Texas

———————◆———————

# OBEL CRUZ-GARCIA

v.

# THE STATE OF TEXAS

———————◆———————

## STATE'S APPELLATE BRIEF

———————◆———————

DEVON ANDERSON
District Attorney
Harris County, Texas

JESSICA AKINS
Assistant District Attorney
Harris County, Texas

NATALIE TISE
JUSTIN WOOD
Assistant District Attorneys
Harris County, Texas

1201 Franklin, Suite 600
Houston, Texas 77002
Telephone: 713.755.5826
Fax: 713.755.5809

*Counsel for the State of Texas*

Oral argument conditionally waived

## IDENTIFICATION OF THE PARTIES

Pursuant to TEX. R. APP. P. 38.2(a)(1)(A), a complete list of the names of all interested parties is provided below.

*Victim:*

    **A.G.** — a child victim referred to as Adam, age six

*Counsel for the State:*

    **Devon Anderson,** District Attorney of Harris County
    **Jessica Akins,** Assistant District Attorney on appeal
    **Natalie Tise & Justin Wood,** Assistant District Attorneys at trial
    1201 Franklin, Suite 600, Houston, Texas 77002

    **Lisa McMinn**, State Prosecuting Attorney
    P. O. Box 13046, Austin, Texas 78711

*Appellant or criminal defendant:*

    **Obel Cruz-Garcia**

*Counsel for Appellant:*

    **R.P. Cornelius & Mario Madrid** — Counsel at trial
    **Wayne T. Hill** — Counsel on appeal
    4615 Southwest Frwy, Suite 600, Houston, Texas 77027

*Trial Judge:*

    **Honorable Renee Magee** — Presiding Judge

# TABLE OF CONTENTS

IDENTIFICATION OF THE PARTIES ................................................................. i

INDEX OF AUTHORITIES .......................................................................... iii

STATEMENT REGARDING ORAL ARGUMENT ............................................ 1

STATEMENT OF THE CASE ....................................................................... 1

STATEMENT OF FACTS ............................................................................. 2

SUMMARY OF THE ARGUMENT ............................................................... 15

REPLY TO APPELLANT'S FIRST ISSUE ..................................................... 16

REPLY TO APPELLANT'S SECOND ISSUE .................................................. 23

REPLY TO APPELLANT'S THIRD ISSUE ..................................................... 26

REPLY TO APPELLANT'S FOURTH & FIFTH ISSUES ................................. 33

REPLY TO APPELLANT'S SIXTH & SEVENTH ISSUES ............................... 38

REPLY TO APPELLANT'S EIGHTH, NINTH, TENTH & ELEVENTH ISSUES.. 43

REPLY TO APPELLANT'S TWELFTH ISSUE ............................................... 55

CONCLUSION ........................................................................................... 65

CERTIFICATE OF SERVICE ....................................................................... 66

# INDEX OF AUTHORITIES

## CASES

*Allen v. State,*
149 S.W.3d 254 (Tex. App.—
Fort Worth 2004, pet. ref'd)................................................................48

*Bargas v. State,*
252 S.W.3d 876 (Tex. App.—
Houston [14th Dist.] 2008, no pet.)..................................................30

*Bigby v. State,*
892 S.W.2d 864 (Tex. Crim. App. 1994).......................................35, 37

*Borjan v. State,*
787 S.W.2d 53 (Tex. Crim. App. 1990)...............................................43

*Brooks v. State,*
323 S.W.3d 893 (Tex. Crim. App. 2010) ............................................26

*Brown v. State,*
270 S.W.3d 564 (Tex. Crim. App. 2008) ............................................43

*Burks v. State,*
227 S.W.3d 138 (Tex. App—
Houston [1st Dist.] 2006, pet. ref'd) ..................................................36

*Burks v. State,*
876 S.W.2d 877 (Tex. Crim. App. 1994) .......................................35, 36

*Cantrell v. State,*
731 S.W.2d 84 (Tex. Crim. App. 1987) ...............................................35

*Carlock v. State,*
8 S.W.3d 717 (Tex. App.—
Waco 1999, pet. ref'd)........................................................................51

*Chambers v. Mississippi,*
410 U.S. 284 (1972)............................................................................41

*Clark v. State,*
365 S.W.3d 333 (Tex. Crim. App. 2012).............................................24

*Cockrell v. State,*
  933 S.W.2d 73 (Tex. Crim. App. 1996) ...................................................49

*Cofield v. State,*
  891 S.W.2d 952 (Tex. Crim. App. 1994) ............................................. 40

*Colyer v. State,*
  428 S.W.3d 117 (Tex. Crim. App. 2014) ......................................... 57, 62

*Curry v. State,*
  30 S.W.3d 394 (Tex. Crim. App. 2000) ...............................................29

*Darrow v. State,*
  504 S.W.2d 416 (Tex. Crim. App. 1974) ...........................................23

*Dossett v. State,*
  216 S.W.3d 7 (Tex. App.—
  San Antonio 2006, pet. ref'd) ................................................... 22, 23

*Druery v. State,*
  225 S.W.3d 491 (Tex. Crim. App. 2007) ......................................... 19

*Foster v. State,*
  180 S.W.3d 248 (Tex. App.—
  Fort Worth 2005, pet. ref'd) ..........................................................25

*Fountain v. State,*
  401 S.W.3d 344 (Tex. App.—
  Houston [14th Dist.] 2013, pet. ref'd) .........................................30

*Freeman v. State,*
  340 S.W.3d 717 (Tex. Crim. App. 2011) ................................. 43, 45, 46

*Fuentes v. State,*
  991 S.W.2d 267 (Tex. Crim. App. 1999) ............................................50

*Garcia v. State,*
  246 S.W.3d 121 (Tex. App.—
  San Antonio 2007, pet. ref'd) .......................................................51

*Garcia v. State,*
  537 S.W.2d 930 (Tex. Crim. App. 1976) ..........................................23

*Geeslin v. State,*
  630 S.W.2d 512 (Tex. App.—
  Fort Worth 1982, no pet.) .............................................................35

*Green v. State,*
 No. AP-76458, 2012 WL 4673756
 (Tex. Crim. App. 2012) ...................................................................54

*Hawkins v. State,*
 135 S.W.3d 72 (Tex. Crim. App. 2004) ...........................................52

*Hines v. State,*
 3 S.W.3d 618 (Tex. App.—
 Texarkana 1999, pet. ref'd) ............................................................63

*Hines v. State,*
 38 S.W.3d 805 (Tex. App.—
 Houston [14th Dist.] 2001, no pet.) ................................................20

*Holden v. State,*
 201 S.W.3d 761 (Tex. Crim. App. 2006) .........................................57

*Holmes v. South Carolina,*
 547 U.S. 319 (2006) .......................................................................41

*Hyde v. State,*
 846 S.W.2d 503 (Tex. App.—
 Corpus Christi 1993, pet. ref'd) ......................................................37

*In re E.A.K.,*
 192 S.W.3d 133 (Tex. App.—
 Houston [14th Dist.] 2006, pet. denied) ..........................................41

*Irby v. State,*
 327 S.W.3d 138 (Tex. Crim. App. 2010) .........................................24

*Jackson v. State,*
 17 S.W.3d 664 (Tex. Crim. App. 2000) ...........................................20

*Jackson v. Virginia,*
 443 U.S. 307 (1979) .......................................................................26

*Johnson v. State,*
 698 S.W.2d 154 (Tex. Crim. App. 1985) ..........................................46

*Jones v. State,*
 944 S.W.2d 642 (Tex. Crim. App. 1996) ..........................................27

*Kelly v. State,*
 24 S.W.2d 568 (Tex. Crim. App. 1992) ............................................20

*Krebsbach v. State,*
   962 S.W.2d 728 (Tex. App.—
   Amarillo 1998, pet. ref'd) ................................................................32

*Ladd v. State,*
   3 S.W.3d 547 (Tex. Crim. App. 1999) ...............................................54

*Lagrone v. State,*
   942 S.W.2d 602 (Tex. Crim. App. 1997) ...........................................22

*Lewis v. State,*
   815 S.W.2d 560 (Tex. Crim. App. 1991) ........................................... 41

*Lucero v. State,*
   246 S.W.3d 86 (Tex. Crim. App. 2008) .............................................64

*Maddox v. State,*
   682 S.W.2d 563 (Tex. Crim. App. 1985) ........................................... 16

*Martinez v. State,*
   17 S.W.3d 677 (Tex. Crim. App. 2000) ....................................... 45, 53

*Martinez v. State,*
   178 S.W.3d 806 (Tex. Crim. App. 2005) ........................................... 40

*McDuff v. State,*
   939 S.W.2d 607 (Tex. Crim. App. 1997) ............................................31

*McFarland v. State,*
   845 S.W.2d 824 (Tex. Crim. App. 1992)............................................50

*McGregor v. State,*
   394 S.W.3d 90 (Tex. App.—
   Houston [1st Dist.] 2012, pet. ref'd) ..........................................19, 33

*McKay v. State,*
   707 S.W.2d 23 (Tex. Crim. App. 1985) .............................................47

*McQuarrie v. State,*
   380 S.W.3d 145 (Tex. Crim. App. 2012)................................57, 61, 62

*Melendez–Diaz v. Massachusetts,*
   557 U.S. 305 (2009) ..........................................................................24

*Morris v. State,*
   322 S.W.2d 632 (Tex. Crim. App. 1959) ............................................31

*Mosley v. State,*
    983 S.W.2d 249 (Tex. Crim. App. 1998) ...................................................... 45, 47, 53

*Muniz v. State,*
    851 S.W.2d 238 (Tex. Crim. App. 1993) ...................................................... 27

*Oliver v. Quaterman,*
    541 F.3d 329 (5th 2008) .............................................................................. 63, 64

*Page v. State,*
    137 S.W.3d 75 (Tex. Crim. App. 2004) ...................................................... 33

*Penry v. State,*
    903 S.W.2d 715 (Tex. Crim. App. 1995) ...................................................... 50

*Ramon v. State,*
    159 S.W.3d 927 (Tex. Crim. App. 2004) ...................................................... 53

*Renteria v. State*
    206 S.W.3d 689 (Tex. Crim. App. 2006) ...................................................... 41

*Rodriguez v. State,*
    486 S.W.2d 355 (Tex. Crim. App. 1972) ...................................................... 32

*Romero v. State,*
    800 S.W.2d 539 (Tex. Crim. App. 1990) ...................................................... 16, 17

*Salazar v. State,*
    38 S.W.3d 141 (Tex. Crim. App. 2001) ........................................................ 56

*Sharp v. State,*
    707 S.W.2d 611 (Tex. Crim. App. 1986) ...................................................... 29

*Smith v. State,*
    No. AP-75793, 2010 WL 3787576
    (Tex. Crim. App. 2010) ............................................................................... 42

*State v. Ross,*
    32 S.W.3d 853 (Tex. Crim. App. 2000) ...................................................... 16

*Tate v. State,*
    414 S.W.3d 260 (Tex. App.—
    Houston [1st Dist.] 2013, no pet.) .............................................................. 65

*Torres v. State,*
    71 S.W.3d 758 (Tex. Crim. App. 2002) ...................................................... 40

*Torres v. State,*
    794 S.W.2d 596 (Tex. App.—
    Austin 1990, no pet.) .................................................................36

*Trout v. State,*
    702 S.W.2d 618 (Tex. Crim. App. 1985).................................57

*Turro v. State,*
    950 S.W.2d 390 (Tex. App.—
    Fort Worth 1997, pet. ref'd) ...................................................31

*Wallace v. State,*
    106 S.W.3d 103 (Tex. Crim. App. 2003)................................64

*Weatherred v. State,*
    15 S.W.3d 540 (Tex. Crim. App. 2000) ................................. 40

*Wesbrook v. State,*
    29 S.W.3d 103 (Tex. Crim. App. 2000)..................................47

*White v. State,*
    225 S.W.3d 571 (Tex. Crim. App. 2007) ...............................55

*Wilson v. State,*
    179 S.W.3d 240 (Tex. App.—
    Texarkana 2005, no pet.) .........................................................50

*Wilson v. State,*
    7 S.W.3d 136 (Tex. Crim. App. 1999)....................................27

*Wilson v. State,*
    938 S.W.2d 57 (Tex. Crim. App. 1996)..................................47

*Zarate v. State,*
    908 S.W.2d 544 (Tex. App.—
    Fort Worth 1995, pet. ref'd) ...................................................48

## STATUTES

TEX. CODE CRIM. PROC. ANN.
    art. 37.071 § 2 (a)(1) (West 2013) .........................................38

TEX. PENAL CODE ANN.
    § 7.02(a)(2) (West 2013) ..........................................................26

TEX. PENAL CODE ANN.
    § 7.02(b) (West 2013) ...............................................................26

Tex. Penal Code Ann.
§ 19.03(a)(2)(West 2013)............................................................1

## RULES

Tex. R. App. P. 21.3.................................................................55, 65

Tex. R. App. P. 33.1...................................................................24

Tex. R. App. P. 33.1(a) ..............................................................50

Tex. R. App. P. 38.2(a)(1)(A) ........................................................i

Tex. R. App. P. 44.2(b)...........................................................45, 47

Tex. R. Evid. 401.....................................................................25

Tex. R. Evid. 402.....................................................................25

Tex. R. Evid. 403..............................................................25, 33, 36

Tex. R. Evid. 404(b) .................................................................33

Tex. R. Evid. 606(b).................................................................57

Tex. R. Evid. 702.....................................................................20

Tex. R. Evid. 801(d) .................................................................40

Tex. R. Evid. 802.....................................................................40

Tex. R. Evid. 901(a) .................................................................19

TO THE HONORABLE COURT OF CRIMINAL APPEALS:

### STATEMENT REGARDING ORAL ARGUMENT

Pursuant to TEX. R. APP. P. 39.7, the State only requests oral argument if this Court deems it necessary. Appellant waived argument on the front cover of his brief and within his brief.

————————◆————————

### STATEMENT OF THE CASE

Appellant was charged by indictment with the offense of capital murder. (CR 2-3). The indictment alleges appellant intentionally killed Adam while in the course of committing kidnapping on September 30, 1992. (CR 2-3; RR XVII 17-18). TEX. PENAL CODE ANN. § 19.03(a)(2)(West 2013).

After finding appellant guilty of the charged offense, the jury answered the punishment special issues in a manner mandating the imposition of the death penalty. (CR 506, 523-527, 530-531; RR XXIII 100-104; RR XXVII 9-11). TEX. CODE CRIM. PROC. ANN. art. 37.071 §2(g) (West 2013). Direct appeal to this Court is automatic. TEX. CODE CRIM. PROC. ANN. art. 37.071 §2(h) (West 2013).

————————◆————————

## STATEMENT OF FACTS

The victim in this case is six-year-old Adam, the son of Diana Garcia; he lived with his mother and her boyfriend Arturo Rodriguez in an apartment in 1992. (CR 2-3; RR XVIII 125, 144-145, 195-197, 205). After Arturo lost his job, he began selling drugs out of their apartment to support the family. (RR XVIII 127-128, 197-199). When Diana found out, she was unhappy, but ended up helping him since he could not find work. (RR XVIII 128, 198).

Appellant supplied the drugs to Arturo and Diana; they knew him as "Chico." (RR XVIII 128-129, 141, 167, 172, 177, 199-201; RR XX 84, 93; State's Exhibit Number 83). They also knew one of his associates, Carmelo Martinez Santana, who went by the name "Rudy." (RR XVIII 138, 142; RR XX 85; RR XXI 39; State's Exhibit Number 85). The family knew both of them very well, and Diana even leased an apartment for appellant and his wife Angelita because they had credit issues. (RR XVIII 135-138, 201-202; RR XIX 11; RR XX 93-94; State's Exhibit Number 42). Although they were close friends, Diana and others noted that appellant was a strong person, the leader of the drug operation and everyone in the group took direction from him. (RR XVIII 138-139; RR XIX 152-155; RR XX 123). Two to three weeks prior to the offense, Diana and Arturo decided to stop selling drugs for appellant, and he was not happy about it. (RR XVIII 133-134, 203-204).

On the evening of September 30, 1992, shortly before midnight, the couple was awakened to a loud noise; the front door of their apartment was kicked in. (RR XVIII 47-48, 69, 149, 206-207; RR XIX 58; State's Exhibit Number 11). Arturo got out of bed and encountered a tall masked man holding a gun. (RR XVIII 149-151, 208-209; RR XIX 34). This man gave them both instructions; he forced Diana on the bed and tied up Arturo with the alarm clock cord. (RR XVIII 74, 77, 152-153, 158-160, 210-212). He repeatedly kicked Arturo and hit him over the head with the handgun until he was knocked unconscious. (RR XVIII 153-158, 212-213; RR XIX 77).

A second gunman entered the room, tied up Diana and sexually assaulted her. (RR XVIII 78, 157-158, 210, 212, 214). Diana testified she knew the assailant ejaculated because she felt a substance between her legs. (RR XVIII 165). Adam was lying on a pallet on the floor and Diana heard him crying while she was being raped and Arturo was being assaulted. (RR XVIII 146, 155, 158). After the sexual assault, the two men ransacked the bedroom and left the apartment. (RR XVIII 160-162; State's Exhibit Numbers 20, 23, 24, 27 & 28). Soon after, Diana realized Adam was no longer in the apartment and went outside; her neighbor called the police to report the sexual assault and kidnapping. (RR XVIII 163-164).

The couple needed immediate medical attention; Arturo suffered injuries to the back of his head and Diana went to the hospital for a sexual assault exam. (RR

3

XVIII 51-52, 89, 163, 165, 217; RR XIX 57). SANE nurse Gloria Kologinczok performed a sexual assault examination of Diana at 3:45 a.m. on October 1, 1992 at St. Joseph's Hospital in Houston. (RR XIX 41-50; State's Exhibit Number 33). At 4:25 a.m., she turned over the evidence collection kit, which included panties, vaginal swabs, a known saliva sample and a known blood sample, to HPD Officer Bredemeyer. (RR XIX 49-50, 58-59; State's Exhibit Numbers 33A, 33B, 33C & 33D). Bredemeyer maintained custody of the evidence and transported it to the HPD property room. (RR XIX 59-60). A cigar found in the apartment that did not belong to Diana or Arturo was collected as evidence. (RR XVIII 80-82).

Diana was unable to give a description of the second man who raped her, as she did not see his face or hear his voice. (RR XVIII 162). But she described the first man, the tall one who assaulted her husband. (RR XVIII 98-99, 101-102). She recalled he had a dark complexion and spoke in the Spanish language, but with a foreign accent, not a Hispanic accent that one would hear in Mexico. (RR XVIII 99, 152). Arturo described it as a Central American accent. (RR XVIII 211).

Police learned from neighbors that Diana and Arturo had recently been selling drugs out of their apartment. (RR XVIII 56). Believing this was crucial to the investigation of Adam's kidnapping, Officer Hernandez interviewed both Diana and Arturo. (RR XIX 65-67). They initially denied being involved with

4

drugs, but later admitted their involvement and told authorities appellant was their drug supplier. (RR XVIII 166-167, 199, 218; RR XIX 65-75).

The FBI initially suspected appellant in the abduction of Adam, but learned he fled the country soon after the offense. (RR XIX 135-139, 144-145; XX 98-100). When appellant's wife Angelita learned about Adam's abduction on the news, she was shocked. (RR XX 96). She recalled appellant did not have an appropriate reaction and then abruptly informed her he was going to Puerto Rico. (RR XX 96-100, 102-103).

HPD Sergeant Swaim went to appellant's apartment on October 6, 1992. (RR XIX 184-185). At the apartment, Swaim encountered a Hispanic man who identified himself as Candido Lebron. (RR XIX 185-186; State's Exhibit Number 84). Swaim interviewed him, but doubted his identity because the man could not provide the name of his parents that were listed on the birth certificate he provided. (RR XIX 186). Swaim later learned the man's true identity was Rogelio Aviles-Barroso, appellant's co-defendant in this case. (RR XIX 186-187; RR XX 130-131; RR XXI 88-89; State's Exhibit Number 84).

More than a month after the abduction, on November 5, 1992, the body of a young boy was found in Baytown. (RR XVIII 91-92, 218-219; RR XIX 191-192; RR XXI 86). Dental records confirmed the identity as Adam and the manner of death was ruled a homicide. (RR XVIII 92; RR XIX 205; XX 4-15, 24-25). Although his

remains were skeletal by that time, Adam was still wearing the Batman pajamas he had gone to bed in on September 30, 1992. (RR XVIII 92, 168-169; RR XIX 193-194, 202-204; State's Exhibit Numbers 48, 51 & 61).

Approximately one month after Adam's body was found, Angelita Rodriguez traveled to Puerto Rico. (RR XX 105). While there, she met with appellant and told him she wanted a divorce. (RR XX 105-106). Appellant told Angelita he would not agree to a divorce and threated to harm her family. (RR XX 106-107). Angelita asked appellant if he had anything to do with Adam's disappearance and appellant admitted he killed Adam. (RR XX 107).

Several years passed and the case went unsolved. In 2007, as part of a cold case investigation, HPD Sergeant Mehl reviewed the case file and located appellant in Puerto Rico. (RR XX 37-43, 49). A sample of appellant's DNA was obtained and compared to the sexual assault kit and cigar left at the crime scene; analysis revealed appellant was the man who raped Diana in 1992. (RR XX 44-52, 55, 72-78; RR XXI 92-93, 105-107, 109, 117-120, 156-157, 160-162, 168; State's Exhibit Numbers 32, 33, 65, 66, 68, 76, 77 & 95).

When the case was re-opened, FBI Special Agent Eric Johnson located Carmelo Martinez Santana in a Pennsylvania prison. (RR XX 165-166, 176-178). At the time of this trial, Santana was serving time on two federal convictions for drug trafficking and weapons possession. (RR XX 118-119; RR XXI 18-19, 29-30).

When he interviewed Santana, FBI Special Agent William Ebersole gathered significantly more information than was previously known about Adam's murder. (RR XX 175-183; RR XXI 11-14, 65-77).

Santana is Angelita's cousin and moved from the Dominican Republic to Puerto Rico, and then to the United States in 1992 with Angelita and appellant. (RR XX 117-120). Santana came to the U.S. with appellant to work in the drug business with him, selling cocaine. (RR XX 120-123). He was known to the parties in appellant's drug ring as "Rudy." (RR XX 116). Santana described appellant as a violent, controlling leader; one who was protective of his drug business and became angry when his people wanted out of the business. (RR XX 123-127). Santana testified appellant had once tied him up and threatened to kill him when he thought Santana was taking drug clients from him. (RR XX 124).

Santana recalled on September 30, 1992, appellant wanted to go to Diana's apartment to look for drugs and money, so he and Aviles-Barroso accompanied appellant. (RR XX 135-137). Santana remained in the car while appellant and Aviles-Barroso went inside the apartment. (RR XX 137-138). Both appellant and Aviles-Barroso were wearing ski masks and possessed weapons; Santana recalled appellant had a gun and Aviles-Barroso had a knife. (RR XX 137-142; RR XXI 52).

Santana estimated they were in the apartment for approximately 30 minutes. (RR XX 143). When they returned, Santana was surprised to see

appellant holding a little boy in his arms. (RR XX 143-144). Santana immediately asked appellant why he had taken Adam and appellant replied that the child had seen his face and recognized him. (RR XX 144; State's Exhibit Number 31). Santana was unsuccessful in trying to convince appellant to take Adam back inside to his mother. (RR XX 145-147). Appellant then admitted to Santana that he raped Diana. (RR XX 145).

Appellant put Adam in the backseat of the vehicle and drove the group to Baytown. (RR XX 147-149). He stopped in a secluded area and they all got out of the vehicle; appellant stated to Aviles-Barroso, "You already know what you have to do." (RR XX 149-150; RR XXI 60). Santana immediately felt nauseous and became ill; he walked away from them and defecated in the woods. (RR XX 150; RR XXI 9). During this time, appellant followed Santana to see what he was doing and Santana heard Adam scream and moan. (RR XX 150-151, 160). When Santana returned to the vehicle, he saw that Adam was dead and covered in blood throughout his torso. (RR XX 151-152; RR XXI 10).

Appellant ordered Santana and Aviles-Barroso to put the body back into the vehicle and they obeyed. (RR XX 152). Appellant drove them to a rural area and instructed them to throw the body in a nearby river. (RR XX 152-153). He further instructed them to sink the child, so Santana and Aviles-Barroso gathered some rocks and placed them on top of the body. (RR XX 153-154).

8

Afterward, when they were driving back toward Pasadena, they had several flat tires. (RR XX 154-155). They called a friend Charlie for help with transportation and appellant made Santana and Aviles-Barroso swear they would never tell anyone what happened. (RR XIX 156-161, 172; RR XX 156; RR XXI 44, 61). Charlie would not come get them, so they took a taxi to Charlie's house to borrow a vehicle. (RR XIX 161-166; RR XX 156-157). Charlie's girlfriend, Linda Hernandez, recalled that Santana seemed extremely nervous. (RR XIX 163; RR XX 157). Appellant instructed Santana to get rid of the knife and told Santana he was leaving town because of what he did that night. (RR XX 158-159, 166).

The following day, appellant changed the tires on his vehicle, washed out the blood and sold it. (RR XX 160-162). Appellant used the money he got from the car sale to buy a plane ticket out of the country. (RR XX 162). Santana took appellant to the airport and never saw him again. (RR XX 162, 164).

16 years after Adam's death, capital murder charges were filed against appellant and Rogelio Aviles-Barroso. (RR XX 55-56; RR XXI 91). After the jury found appellant guilty of capital murder, they heard evidence that appellant committed multiple other violent crimes, demonstrating he is a continuing threat to society. (CR 506, 523).

Carmelo Martinez Santana testified during the punishment phase to shed light on appellant's actions prior to Adam's murder. (RR XXV 59-89). Santana

9

described appellant's behavior when appellant believed Santana was stealing his money and drug customers. Appellant tied him up, threw him in a bathtub, gagged him and threatened to kill him, until Santana gave him money and promised never to betray him. (RR XXV 61-64).

Santana relayed another incident where appellant sought retribution against a drug competitor, a man named Patiko. (RR XXV 65-71). In a distinctly similar manner to the charged offense, appellant, Santana and another man broke into Patiko's apartment. (RR XXV 66-69). Santana waited in the car while appellant and the other man went inside to burglarize the apartment. (RR XXV 69). When they returned 20 minutes later, they were carrying drugs and money. (RR XXV 69-70). Appellant told Santana that he had tied up and beaten Patiko and then raped his girlfriend. (RR XXV 70-71). Santana recalled when he spent time with appellant, they frequently burglarized people in the drug business. (RR XXV 71).

In July of 1989, appellant kidnapped and killed a drug associate named Saul Flores. (RR XXV 22-33, 72-85, 99, 121; State's Exhibit Number 122). Appellant learned that Saul was interested in his girlfriend, Elizabeth Ramos, and became infuriated. (RR XXV 49-50, 74-75). Appellant, Santana and a man named Robert went over to Elizabeth's apartment where they found Saul. (RR XXV 75-76).

They grabbed him, put him in their car and transported him to a drug apartment on Winkler where they sold drugs. (RR XXV 76-77).

Appellant tied up Saul and began beating him. (RR XXV 79). Appellant repeatedly hit Saul with a hammer and injected him with drugs. (RR XXV 80-81, 93-94). Santana saw appellant get on top of Saul and apply pressure to his neck until he died. (RR XXV 81-82). Appellant instructed Santana to help him put Saul's body in the bathtub and they left the apartment. (RR XXV 82-83).

Tina Perez, a friend of Elizabeth's, went over to the apartment on Winkler looking to buy some drugs. (RR XXV 24-30). The door was open, but no one was there; she went inside and saw Saul's body in the bathtub. (RR XXV 30-33). When appellant learned the police wanted to question Tina about Saul, he told her to keep quiet, and tell the police she had not seen anything. (RR XXV 32-35).

Soon after, appellant returned to the apartment with his drug associates and they carried Saul's body to the dumpster. (RR XXV 7-19, 84-85). An autopsy revealed Saul had suffered multiple blunt force traumas, had cocaine in his blood and had been restrained and strangulated. (RR XXV 97-111).

In October of 2001, while in Puerto Rico, appellant attempted to kill a restaurant business owner and kidnapped two men. (RR XXIV 14-42). Appellant pointed a revolver at Manuel Buten and attempted to shoot him two times, but

luckily the gun did not fire and Buten was able to run away. (RR XXIV 23-25, 82-83, 102).

Buten later learned appellant had kidnapped two family members who worked at the restaurant, his brother Andres Buten and his step-son William Martinez, who was only 16. (RR XXIV 18, 20, 26, 83-97, 99, 102-106). Appellant called Buten and demanded a large amount of cocaine and cash in exchange for the safe release of the two men. (RR XXIV 29-32, 47). Appellant threatened to kill them if Buten called the police or failed to comply with his demands. (RR XXIV 31, 37). With the assistance of law enforcement, Buten negotiated with appellant and he was apprehended. (RR XXIV 41, 48-58).

Agent Rodriguez convinced appellant to let the men go; while in custody appellant called his wife and instructed her to release Andres and William. (RR XXIV 58-60). Both of the men had been severely injured and were taken to the hospital. (RR XXIV 60, 95-96, 105-111).

Andres described how appellant treated him while he was confined. (RR XXIV 84-94). Andres was bound with wire from a coat hanger while appellant repeatedly punched him, kicked him, hit him over the head with a shower curtain, hit his feet with a mallet and urinated on him. (RR XXIV 86-90, 93-94). Appellant told Andres he was going to kill him. (RR XXIV 87). William testified appellant physically beat him as well; appellant threw him to the floor, stomped

on his back and spit on him. (RR XXIV 105-108). Appellant also hit William with a revolver, tied him up with the wire from a coat hanger and held a knife to his throat, toes and penis, threatening to cut him. (RR XXIV 109-110).

Appellant and his accomplices were charged with kidnapping and possession of weapons. (RR XXIV 64-65). Appellant pled guilty to the charges and was sentenced to 16 years confinement in Puerto Rico. (RR XXIV 65-67; State's Exhibit Number 121). While incarcerated, an inspection of appellant's cell revealed his plans to escape, the window pane was loose and open to the outside and he had hidden a rope of bed sheets and a map of Puerto Rico. (RR XXIV 120-127). A cell phone was also found on his person, which is prohibited in a correctional facility. (RR XXIV 128).

Appellant continued to cause safety concerns while incarcerated in the United States. (XXV 134-135, 139-140). He was booked into the Harris County Jail on February 12, 2010 and was classified as a high-risk inmate and placed into administrative separation, where he remained for two years. (RR XXV 145). Two months after being moved from separation, on September 23, 2012, appellant possessed a prohibited weapon in a penal institution, by confiscating a razor blade and hiding it inside his bed. (XXV 126-133, 137-138, 145, 147).

After the presentment of punishment evidence, the jury answered the special issues in a manner mandating the imposition of the death penalty. (CR 523-527; RR XXVIII 3-5).

In the first special issue, the jury unanimously found from the evidence beyond a reasonable doubt there is a probability that appellant would commit acts of violence that would constitute a continuing threat to society. (CR 523; RR XXVIII 3).

In the second special issue, the jury unanimously found from the evidence beyond a reasonable doubt that appellant himself actually caused the death of Adam, on the occasion in question, or if he did not actually cause the death of Adam, that he intended to kill Adam, or that he anticipated that a human life would be taken. (CR 524; RR XXVIII 3-4).

In the third special issue, the jury unanimously found, after taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, that there was not sufficient mitigating circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed. (CR 525-526; RR XXVIII 4).

The trial court orally sentenced appellant to death. (RR XVIII 4-5).

———————◆———————

## SUMMARY OF THE ARGUMENT

Appellant's conviction for capital murder and imposition of the death penalty should be affirmed by this Court.

**Reply to appellant's first issue** — Appellant has not shown the trial court abused its discretion in denying his motion to suppress evidence, where the State established the chain of custody and there was nothing to indicate the evidence was contaminated. None of the evidence admitted into evidence was tested by the HPD crime lab.

**Reply to appellant's second issue** — Appellant's confrontation complaints are not preserved for this Court's review because he did not make an objection at trial.

**Reply to appellant's third issue** — The evidence is legally sufficient to support appellant's conviction for capital murder. Appellant kidnapped a six-year old child and ordered his accomplice to kill him.

**Reply to appellant's fourth and fifth issues** — Appellant has not shown the trial court abused its discretion in admitting extraneous evidence of his bond forfeiture and failure to appear under Rules 403 and 404(b).

**Reply to appellant sixth and seventh issues** — Appellant has not shown the trial court abused its discretion in excluding mitigation evidence regarding his completion of bible study or assistance to law enforcement because it constituted hearsay.

**Reply to appellant's eighth, ninth, tenth and eleventh issues** — Appellant has not shown that closing argument by the prosecutor was impermissible, or that it caused him to suffer harm in this case.

**Reply to appellant's twelfth issue** — Appellant has not shown the trial court erred in denying his motion for a new trial based upon jury misconduct, where he claims the act of the jury foreman referring to his Bible during deliberations was an outside influence.

————————◆————————

## REPLY TO APPELLANT'S FIRST ISSUE

In his first point of error, appellant challenges the trial court's denial of his motion to suppress. Appellant filed a written motion to suppress the results of all DNA testing. (CR 454-456). At the pre-trial hearing, he focused on problems with the HPD crime lab, and suggested the physical evidence in his case was contaminated, and thus the DNA analysis was unreliable. (RR XVI 3-121). The trial court disagreed and found the evidence and test results were relevant and reliable, and denied appellant's motion to suppress. (RR XVII 3-17).

## Standard of Review

A trial court's ruling on a motion to suppress evidence will not be set aside absent a showing of abuse of discretion. *Maddox v. State*, 682 S.W.2d 563, 564 (Tex. Crim. App. 1985). This Court does not engage in its own factual review. Instead, viewing the evidence in the light most favorable to the trial court's ruling, this Court considers only whether the trial court improperly applied the law to the facts. *Romero v. State*, 800 S.W.2d 539, 543 (Tex. Crim. App. 1990).

At a suppression hearing, the trial court is the sole judge of the credibility of the witnesses and the weight to be given their testimony. *Id; see also State v. Ross*, 32 S.W.3d 853, 855 (Tex. Crim. App. 2000) (because the trial court is the exclusive finder of fact in a motion to suppress hearing, it may choose to believe or disbelieve all or any part of a witness's testimony). Therefore, if the record supports the trial

16

court's findings, this Court should not disturb those findings. *Romero*, 800 S.W.2d at 543.

<u>Motion to Suppress Evidence</u>

The State presented testimony from SANE nurse Gloria Kologinczok. (RR XVI 23-25; XIX 37-50; State's Exhibit Number 1). She was working at St. Joseph's Hospital in Houston on October 1, 1992 and performed a sexual assault examination of Diana Garcia at 3:45 a.m. (RR XVI 25; RR XIX 43). Shortly after, at 4:24 a.m., she turned over the sexual assault evidence collection kit to HPD Officer W.T. Bredemeyer. (RR XVI 25; RR XIX 49, 59; State's Exhibit Number 33). He maintained custody of the evidence and transported it to the HPD property room. (RR XIX 59-60).

Police were unsuccessful in making contact with appellant during the initial investigation of this case in 1992; appellant fled the country after the offense was committed. (RR XVI 36). The case went unsolved and was re-opened 15 years later. (RR XVI 28-30).

In November of 2004, a cold case squad within HPD homicide was created. (RR XVI 28). In September 2007, HPD Sergeant Mehl located evidence in the HPD property room that had been collected in 1992. (RR XVI 29-30). On October 2, 2007, Mehl sent some blood samples and three pieces of evidence to Orchid Cellmark for analysis — a cigar, a sexual assault examination kit and a cutting

17

from a pair of women's panties. (RR XVI 30-35). At that time, HPD did not possess a DNA sample for appellant. (RR XVI 36-37).

In 2008, HPD Sergeant Stephens located appellant in a Puerto Rican prison and obtained a court order for a sample of his DNA. (RR XVI 37-38). FBI agents in Puerto Rico went to the prison where appellant was incarcerated and obtained the DNA sample. (RR XVI 38). Mehl received the sample on May 23, 2008 and then shipped it to Orchid for analysis with the previous items. (RR XVI 38-39).

The evidence was received by Matt Quartaro, a supervisor with Orchid Cellmark. (RR XVI 48-60). Instead of relying on the DNA extractions done by HPD, Orchid performed their own DNA extractions from the evidence. (RR XVI 51). When Orchid received appellant's DNA sample, it was compared against the three main pieces of evidence — the cigar, the sexual assault examination kit and a cutting from the panties. (RR XVI 59-60).

Orchid's report indicated: the DNA profile on the cigar left at the crime scene was a match for appellant; the sperm fraction from the cutting of the panties was a mixture of DNA and the major DNA profile belonged to appellant; and appellant could not be ruled out as the contributor to the DNA mixture from the vaginal swab. (RR XVI 39, 59-60). In terms of the statistical profile match, Quartaro testified the probability of that DNA profile repeating in the North American population was 1 in 71.5 quadrillion of unrelated individuals. (RR XVI

18

59-60). Once Mehl received this report, he filed capital murder charges on appellant. (RR XVI 39).

Analysis

Appellant claims the trial court abused its discretion in admitting evidence, the cigar, panties and sexual assault kit that included blood samples and vaginal swabs, because the State failed to establish a proper chain of custody; this objection was made during trial and was overruled by the trial judge. (RR XXI 120-124; State's Exhibit Numbers 33-A, 33-B, 33-C, 33-D and 95).

The State meets the authentication requirement for admissibility of evidence once it has shown the beginning and the end of the chain of custody, particularly when the chain ends at a laboratory. *McGregor v. State*, 394 S.W.3d 90, 125 (Tex. App.—Houston [1st Dist.] 2012, pet. ref'd); *see also* TEX. R. EVID. 901(a). Absent evidence of tampering or fraud, any gaps in the chain of custody do not affect the admissibility of the evidence, but rather go to the weight that the fact-finder should give the evidence, which may be brought out and argued by the parties. *Druery v. State*, 225 S.W.3d 491, 503–504 (Tex. Crim. App. 2007). Appellant does not make a specific claim about a gap in the chain, but instead seems to allege that the evidence was tampered with and/or compromised due to issues at the HPD crime lab before the evidence was tested.

19

The proponent of scientific evidence, such as the DNA test results offered by the State in this case, must prove to the trial judge, by clear and convincing evidence and outside the presence of the jury, that the proffered evidence is reliable and therefore relevant. TEX. R. EVID. 702; *Kelly v. State*, 824 S.W.2d 568, 573 (Tex. Crim. App. 1992) (interpreting Rule 702). Any issue of contamination would be pertinent to the trial court in deciding if the evidence was reliable. *See Jackson v. State*, 17 S.W.3d 664, 670–72 (Tex. Crim. App. 2000) (analyzing whether DNA evidence was reliable when allegations of contamination were raised); *Hines v. State*, 38 S.W.3d 805, 808 (Tex. App.—Houston [14th Dist.] 2001, no pet.) (applying the Kelly reliability analysis to claims of contaminated DNA).

The sexual assault kit of Diana Garcia was collected by a qualified SANE nurse hours after the sexual assault. The kit included Diana's panties, vaginal swabs and blood samples. (RR XVII 6). The kit was sealed and stored in the HPD property room at 1200 Travis. (RR XVII 6-7). In 1992, the evidence was processed and analyzed by employees of the HPD crime lab and then returned to storage, where it remained until 2007, when it was sent to Orchid Cellmark for analysis. (RR XVII 7).

Several blood samples were collected in 1992 and also stored at the HPD property room on Travis — those of Arturo Garcia, Candido Lebron, Bienviendo Melo, Leonardo German and Carmelo Martinez Santana. (RR XVII 7-8). They

20

were tested by the HPD crime lab and returned to the property room in 1992. (RR XVII 8). They were not retrieved again until December 2, 2007, when Sergeant Mehl sent them to Orchid Cellmark. (RR XVII 8). The results from the HPD crime lab were not admitted in this trial; only the results from Orchid Cellmark were admitted. (RR XVII 8).

The cigar taken from the crime scene was stored at the HPD property room on Goliad from October 1992 to October 2007. (RR XVII 6). The cigar was located in a larger container of evidence and there was nothing to indicate it had been tampered with during that time. (RR XVII 6). Although it may have been sent to the HPD crime lab with other evidence, there is nothing to indicate it was ever tested by the lab. (RR XVI 112-113). The package appeared unopened when it was sent to Orchid Cellmark for DNA testing on October 2, 2007. (RR XVII 6, 8).

In 2008, a sample of appellant's DNA sample was obtained and shipped directly to Orchid for analysis. (RR XVI 37-39; RR XVII 10). It was never stored or tested by the HPD crime lab. This known sample was compared against the profiles found in the sexual assault kit evidence and cigar. (RR XVII 10).

In support of his contention that the evidence was tainted, appellant provided the trial court with the Bromwich Report, which detailed issues in the HPD crime lab. (Defense Exhibits 2-7). The report was initiated in 2003 upon the closing of the HPD crime lab and discussed errors that were made by the lab, as

21

well as deficiency in documentation and allegations of misconduct. (RR XVII 12-13). The trial court noted the report made specific recommendations to the address the issues, all of which were followed by HPD. (RR XVII 13-14).

Appellant's contamination argument fails for two reasons. First, the State did not present any evidence in this case that was tested by the old HPD crime lab.[1] Every piece of evidence he complains about was tested by Orchid Cellmark. Second, although the evidence was stored at two of the HPD property rooms, there was no evidence of contamination or tampering.

A time delay in the collection and testing of evidence does not render the evidence unreliable when there is no evidence of contamination or tampering. *See Dossett v. State*, 216 S.W.3d 7, 21-22 (Tex. App.—San Antonio 2006, pet. ref'd) (State sufficiently established chain of custody of victim's sexual assault kit to admit expert testimony about results on DNA testing on samples contained in kit, even though 20–year period existed between collection of kit and DNA testing).

Similarly, the fact that the evidence was previously tested by the HPD crime lab and then returned to HPD storage does not render the evidence unreliable. *See Lagrone v. State*, 942 S.W.2d 602, 617 (Tex. Crim. App. 1997) (absent affirmative evidence of tampering, no reason to exclude evidence merely because it was kept

---

[1] A known DNA sample of appellant was tested by the new HPD crime lab in 2010. The trial court found this evidence was admissible since there were no longer concerns with the lab at that time. And this evidence just corroborated the earlier findings from Orchid Cellmark in 2008. (RR XVII 11-12).

in evidence room for extended period of time and had undergone prior forensic testing).

The State has no burden to disprove tampering; rather, appellant has the burden to present affirmative evidence of tampering. *Garcia v. State*, 537 S.W.2d 930, 934 (Tex. Crim. App. 1976). A showing of the possibility of tampering is not sufficient to bar admission of the evidence, and goes only to the weight of the evidence. *See Darrow v. State*, 504 S.W.2d 416, 417 (Tex. Crim. App. 1974) (evidence that marihuana was stored in officer's locker for two weeks in room to which others had access, but no key to locker, showed only the possibility of tampering, and did not prohibit admission); *see also Dossett*, 216 S.W.3d at 21 (defendant only showed there was a possibility of tampering or contamination, which was insufficient to exclude the evidence).

Appellant has not shown the trial court abused its discretion in denying his motion to suppress. *See Romero*, 800 S.W.2d at 543. Therefore, appellant's first point of error should be overruled.

## REPLY TO APPELLANT'S SECOND ISSUE

In his second issue, appellant claims the trial court violated his right to confrontation, by not allowing him to cross-examine witnesses and present an investigative report to support his defense during his motion to suppress and at trial. The constitutional right of confrontation includes the right to cross-examine

the witnesses at trial and the opportunity to show that a witness is biased or that his testimony is exaggerated or unbelievable. *Irby v. State*, 327 S.W.3d 138, 145 (Tex. Crim. App. 2010).

Appellant complains he was unable to cross-examine three of the State's witnesses, Sergeant Mehl, Agent Guzman and Courtney Head, regarding contamination issues at the HPD crime lab during trial. (Appellant's brief 71-72). But this issue is not preserved for this Court's review. Appellant did not lodge an objection at the hearing or trial on this basis. (RR XVI 108-110; RR XX 56-66; 77; RR XXI 155, 157). A defendant waives his constitutional right to confront witnesses if he does not object at trial. *Melendez–Diaz v. Massachusetts*, 557 U.S. 305, 314 n. 3 (2009); *Clark v. State*, 365 S.W.3d 333, 339 (Tex. Crim. App. 2012). Because appellant did not object on confrontation grounds, he has waived appellate review of his second point of error. *See* TEX. R. APP. P. 33.1.

Further, the subject of appellant's attempted cross-examination was previous contamination problems in the HPD crime lab outlined in a report authored by Michael Bromwich. As discussed in more detail in the State's reply to appellant's first issue, none of the evidence admitted in this case was tested at the HPD crime lab during the time frame of contamination concern, making the evidence irrelevant to the issues in this case.

During the motion to suppress, the trial court determined the report and areas of cross-examination regarding it were not relevant, and thus not admissible under Rules 401 and 402. (RR XVII 12-14). *See* TEX. R. EVID. 401 (evidence is relevant if it tends to make the existence of any fact of consequence tot eh determination of the action more probable or less probable than it would be without the evidence); TEX. R. EVID. 402 (only relevant evidence is admissible). The trial court also found that any potential probative value of the evidence was outweighed by the danger of unfair prejudice, finding it would cause confusion of the DNA issues and mislead the jury. (RR XVII 13-14). *See* TEX. R. EVID. 403.

Because the evidence was not relevant, the trial court did not err in limiting appellant's cross-examination on the subject of contamination. *See Foster v. State,* 180 S.W.3d 248, 251 (Tex. App.—Fort Worth 2005, pet. ref'd) (trial court did not abuse its discretion or violate defendant's right to confrontation when it limited his cross-examination; defendant sought to ask a question that was irrelevant and calculated to confuse the jury because it injected new facts into the case regarding a situation that was not before the jury).

Appellant did not offer any additional argument on why the evidence should be admitted at trial. His second point of error should be overruled.

———————◆———————

## REPLY TO APPELLANT'S THIRD ISSUE

In his third issue on appeal, appellant challenges the legal sufficiency of the evidence supporting his conviction for capital murder.

Appellant was charged with the offense of capital murder, that on or about September 30, 1992, while in the course of committing or attempting to commit the kidnapping of Adam, he intentionally caused the death of Adam by stabbing him with a deadly weapon, namely, a sharp instrument or by some unknown manner and means. (CR 2-3; RR XXIII 4, 31). The jury was charged they could find him guilty as a principal or party to the offense. (CR 487-488). TEX. PENAL CODE ANN. § 7.02(a)(2) (West 2013); TEX. PENAL CODE ANN. § 7.02(b) (West 2013).

In reviewing the legal sufficiency of the evidence to support a conviction, the appellate court views the evidence in the light most favorable to the verdict when determining whether any rational trier of fact could have found the elements of the offense beyond a reasonable doubt. *See Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979); *Brooks v. State*, 323 S.W.3d 893, 895 (Tex. Crim. App. 2010) (the *Jackson* standard is the only standard a reviewing court should apply in determining whether the evidence is sufficient to support a conviction).

The jury, as the sole judge of the facts, is entitled to resolve any conflicts in the evidence, to evaluate the credibility of witnesses, and to determine the weight

given to any particular piece of evidence. *Jones v. State*, 944 S.W.2d 642, 647 (Tex. Crim. App. 1996). When conducting a legal sufficiency review, this Court does not engage in a second evaluation of the weight and credibility of the evidence, but only ensures the jury reached a rational decision. *Muniz v. State*, 851 S.W.2d 238, 246 (Tex. Crim. App. 1993).

Appellant lists several reasons why the evidence is insufficient to support his conviction. He challenges his identification as the culprit, the credibility of four witnesses, as well as the strength of the evidence regarding Diana's sexual assault and Adam's death. Appellant also claims there was no evidence of his motive to commit this crime. (Appellant's brief 76-85).

Appellant challenges the evidence identifying him, focusing on the incorrect descriptions of the suspects as black men by police early in the investigation. Diana and Arturo had described the men as having dark complexions, speaking with Spanish accents. Nothing about the police's initial report renders the evidence of appellant's identity insufficient, especially in the light of the DNA evidence revealing he was the man who sexually assaulted Diana. Although appellant has challenged the admissibility of the DNA evidence, even improperly admitted evidence may be considered when reviewing the legal sufficiency of the evidence. *Wilson v. State*, 7 S.W.3d 136, 141 (Tex. Crim. App. 1999). The evidence of appellant's identity as the perpetrator is sufficient.

Appellant complains that several of the State's key witnesses posed credibility problems and provided testimony that was inconsistent. Diana Garcia and Arturo Rodriguez testified regarding what happened to them at the apartment on September 30, 1992, establishing the sexual assault of Diana, the beating of Arturo and kidnapping of Adam. Appellant complains their testimony was not credible because the couple initially lied to police about their involvement in selling drugs. Diana admitted they lied to police the first night, because they were afraid, but told the truth the following day. (RR XVIII 166-167).

Carmelo Santana provided evidence about the kidnapping and murder of Adam, as he had been with appellant on that night. He established that appellant took Adam from the apartment and ordered Aviles-Barrosso to kill him. Appellant complains Santana's testimony is not credible because he was serving a federal sentence at the time of trial, he had a motive to distance himself from the crime and some of his testimony contradicted his earlier statements.

Angelita Rodriguez was appellant's wife at the time of this offense. She provided evidence about appellant's drug dealing, his immediate flight from the country and testified appellant admitted to her that he killed Adam. Appellant complains she was not a credible witness because she had a motive to see appellant punished, because he had been unfaithful and left her in the U.S.

The concerns appellant has articulated with regard to these witnesses were all presented and argued to the jury during trial. The jury was free to accept one version of the facts and reject another, and they could reject any part of a witness's testimony. *Sharp v. State*, 707 S.W.2d 611, 614 (Tex. Crim. App. 1986). None of these matters render the evidence insufficient. *See Curry v. State*, 30 S.W.3d 394, 406 (Tex. Crim. App. 2000) (any inconsistencies in the evidence are viewed in favor of the verdict).

Appellant complains there was insufficient evidence to show he sexually assaulted Diana. He claims the lack of physical evidence, coupled with the DNA evidence, merely shows sexual contact with Diana, not sexual assault. During closing argument, defense counsel suggested Diana and appellant had a consensual sexual relationship. (RR XXIII 44-45).

But this is contrary to Diana's testimony. She gave very specific details about being blindfolded and sexually assaulted that night. Diana recalled that the perpetrator ejaculated, which was consistent with her physical exam, where DNA evidence was left behind. SANE nurse Kologinczok testified she did not observe any signs of physical injury during Diana's sexual assault exam, but noted that in most exams, she did not find physical injuries. (RR XIX 48-49). Appellant admitted to Santana that he sexually assaulted Diana. (RR XX 145).

Although there was no physical injuries tending to show sexual assault, Diana's testimony and the DNA results were more than sufficient to show appellant was the man who sexually assaulted her. *See Bargas v. State*, 252 S.W.3d 876, 889 (Tex. App.—Houston [14th Dist.] 2008, no pet.) (it is well-settled that a victim's uncorroborated testimony is sufficient on its own to support a conviction for sexual assault and the lack of physical evidence will not render the evidence insufficient). Although the sexual assault evidence was important to show appellant's presence and participation in the kidnapping and murder of Adam, the jury did not have to find the elements of sexual assault beyond a reasonable doubt. Appellant was not charged with the sexual assault of Diana; the underlying felony in the capital murder indictment was kidnapping. (CR 2-3).

Appellant complains the evidence is insufficient to prove he killed Adam as alleged in the indictment because the State, through Dr. Wolf, was unable to provide conclusive evidence regarding Adam's cause of death. But direct evidence is not required. Expert opinion testimony is not required to prove cause of death, and cause of death may be proven solely by circumstantial evidence. *See Fountain v. State*, 401 S.W.3d 344, 356-357 (Tex. App.—Houston [14th Dist.] 2013, pet. ref'd).

Dr. Wolf testified Adam's manner of death was homicide. (RR XX 10-12; State's Exhibit Number 55). He opined that Adam may have been stabbed, but he was unable to provide an opinion on the cause of death due to Adam's

decomposition. (RR XX 8-9, 12). Adam's body was found over a month after his kidnapping and had been submerged in water, so Dr. Wolf was unable to assess his skin surfaces and organs. (RR XX 8). He also stated that any blood from Adam's pajamas would have washed away during the time he was in the water. (RR XX 14-15).

Both DNA evidence and the testimony of Santana placed appellant at the apartment when Adam was kidnapped. Santana explained how appellant directed Aviles-Barrosso, who was carrying a knife, to kill Adam. Santana saw Adam's torso covered in blood and helped sink the body, where it was located a month later, decomposed. Appellant later admitted to his wife that he killed Adam. This evidence establishes Adam's cause of death. *See Morris v. State*, 322 S.W.2d 632, 634 (Tex. Crim. App. 1959) (where the State did not present expert medical testimony regarding victim's cause of death, testimony regarding the victim being stabbed by the defendant was sufficient to establish the cause of death); *see also McDuff v. State*, 939 S.W.2d 607, 614 (Tex. Crim. App. 1997) (the State's inability to produce or identify the body or remains does not preclude a murder conviction).

The evidence is sufficient to support that Adam was stabbed with a deadly weapon, a sharp instrument, or by some unknown manner and means. *See Turro v. State*, 950 S.W.2d 390, 397 (Tex. App.—Fort Worth 1997, pet. ref'd) (although medical examiner conceded his opinions on the time and cause of death were not

absolute and that he could not entirely eliminate the possibility that the victim died from accidental drowning, the evidence was sufficient to support defendant's conviction for murder because proof beyond a reasonable doubt need not be proof beyond all doubt).

Motive is not an element of the offense and thus does not need to be proved in order to establish the commission of capital murder. *See Rodriguez v. State*, 486 S.W.2d 355, 358 (Tex. Crim. App. 1972). While the State need not have proved motive, evidence of motive for the offense was presented, that motive being appellant's revenge for Diana and Arturo leaving the drug trade. *Krebsbach v. State*, 962 S.W.2d 728, 732 (Tex. App.—Amarillo 1998, pet. ref'd). Santana testified they went to the apartment that night to look for drugs and money. When Santana opposed the kidnapping of Adam, appellant explained he took him because Adam saw his face, and arguably could identify him. This evidence could have been considered by the jury in determining appellant's guilt.

Viewing the evidence in the light most favorable to the verdict, the jury could have found the essential elements of capital murder — that appellant murdered Adam in the course of committing kidnapping — beyond a reasonable doubt. Appellant's third point of error should be overruled.

————————◆————————

32

## REPLY TO APPELLANT'S FOURTH & FIFTH ISSUES

In two points of error, appellant complains the trial court erred by admitting extraneous evidence that appellant failed to appear for a court appearance on October 8, 1992 relating to a criminal offense. Appellant's fourth point of error appears to challenge the admission of evidence under Rule 404(b), and his fifth point of error contests the trial court's ruling with regard to Rule 403.

This Court reviews a trial court's decision to admit evidence concerning an extraneous offense for an abuse of discretion. *Page v. State*, 137 S.W.3d 75, 78 (Tex. Crim. App. 2004). As long as the trial court's ruling is within the "zone of reasonable disagreement," the trial court does not abuse its discretion, and this Court should uphold the ruling. *McGregor v. State*, 394 S.W.3d 90, 117 (Tex. App.—Houston [1st Dist.] 2012, pet. ref'd).

Rule 404(b) prohibits the admission of an extraneous offense at trial to prove a defendant's character or to show that the defendant acted in conformity with that character unless admitted for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. TEX. R. EVID. 404(b). Relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. TEX. R. EVID. 403.

The State offered testimony from FBI Special Agent Eric Johnson. (RR XIX 131-145). He joined the kidnapping investigation on October 1, 1992 and his primary suspect was appellant. (RR XIX 135-139). Agent Johnson learned that appellant missed a court appearance on October 8, 1992 for a criminal case in Harris County and his bond was forfeited. (RR XIX 140-142; RR XX 103-104; State's Exhibit Number 36). This was one week after Adam's kidnapping. (RR XIX 142). After speaking with appellant's wife, Agent Johnson began looking for appellant in Puerto Rico. (RR XIX 144-145).

Prior to the presentment of this bond forfeiture evidence, the parties had a lengthy discussion about the admissibility of this evidence. (RR XIX 105-130). The trial court limited its ruling to the fact that appellant had failed to appear for a court appearance and his bond was forfeited. (RR XIX 113-115). The trial judge did not allow Agent Johnson to reveal that the offense was for drug possession or that it was a pending felony offense, finding this information would be too prejudicial. (RR XIX 121). The judge also ordered that the bond forfeiture paperwork be redacted, to delete any references to the offense being a felony or for drug possession.[2] (RR XIX 123-124, 127; State's Exhibit Number 36).

---

[2] FBI Special Agent Johnson explained to the trial judge that he had filed an unlawful flight to avoid prosecution case against appellant after he bond forfeited; he explained he obtained the warrant so he could legally search for appellant throughout the United States. (RR XIX 111-112). But the trial court did not allow evidence of this federal charge to be heard by the jury. (RR XIX 113-115).

Evidence of bond forfeiture may be admissible to show flight under Rule 404(b). *Bigby v. State*, 892 S.W.2d 864, 883 (Tex. Crim. App. 1994); *Geeslin v. State*, 630 S.W.2d 512, 513 (Tex. App.—Fort Worth 1982, no pet.). The evidence of flight is admissible as a circumstance from which guilt may be inferred, even though it may show the commission of an extraneous offense. *Bigby*, 892 S.W.2d at 883. This evidence is also relevant to show efforts made to locate or apprehend a defendant, his pursuit and capture, circumstances of his arrest including his resistance. *Cantrell v. State*, 731 S.W.2d 84, 92-93 (Tex. Crim. App. 1987).

To exclude evidence of flight after relevancy has been established, the defendant has the burden to affirmatively show that the flight was unrelated to the charged offense. *Burks v. State*, 876 S.W.2d 877, 903 (Tex. Crim. App. 1994). Appellant acknowledges the authority upon which the trial court admitted the evidence, but attempts to distinguish it from his case. *Cantrell*, 731 S.W.2d at 92-93. (RR XIX 125-126). Appellant argues because he bond forfeited on a criminal charge that was not the one he was on trial for, i.e. the drug possession case, it was error for the trial court to admit the evidence.

But the timing of appellant's flight from the United States demonstrates it was related to the capital murder. The day after Adam's kidnapping and murder, appellant told his wife and Santana that he was leaving the country and traveling to Puerto Rico. (RR XX 99, 158-159). It was not a planned trip. (RR XX 100, 158-

159). Appellant immediately sold his car, used the money to purchase a plane ticket and had Santana take him to the airport. (RR XX 162, 164). When his wife visited him two months later, appellant admitted he had killed Adam. (RR XX 107). *See Burks v. State*, 227 S.W.3d 138, 148–49 (Tex. App—Houston [1st Dist.] 2006, pet. ref'd) (evidence is relevant to show defendant's consciousness of guilt).

Appellant did not present any evidence to show his failure to appear for court was anything but flight from prosecution for this capital murder. Therefore, he has failed to meet his burden to exclude evidence of flight. *See Burks*, 876 S.W.2d at 904 (flight evidence was relevant and admissible where defendant made no showing that flight was related to a circumstances unrelated to the offense).

Similarly, appellant has not established the prejudicial effect of this evidence outweighs the probative value. TEX. R. EVID. 403. The bond forfeiture evidence in this case was evidence of flight, relevant to show appellant's consciousness of guilt. *Torres v. State*, 794 S.W.2d 596, 598 (Tex. App.—Austin 1990, no pet.) (consciousness of guilt is perhaps one of the strongest kinds of evidence of guilt).

The evidence was significant in that it demonstrated the timing and context of appellant's departure from the United States. Court records indicated appellant had been present for every court appearance on his pending drug case in 1992, at least 14 settings over the span of 15 months, prior to his missed appearance on October 8, 1992. (State's Exhibit Number 36). The documents also reveal

appellant forfeited a $5,000 bond for failing to appear in court. (State's Exhibit Number 36). This evidence established appellant had been diligent about his court appearances until the murder occurred and forfeited a large amount of money when he left the country, making the evidence more probative than prejudicial. *See Hyde v. State*, 846 S.W.2d 503, 505 (Tex. App.—Corpus Christi 1993, pet. ref'd) (a defendant's failure to appear is not the type of misconduct that has a great unfair prejudicial danger).

Appellant has not shown the trial court abused its discretion in admitting evidence of his bond forfeiture under Rule 404(b) or Rule 403. *See Bigby*, 892 S.W.2d at 883-884 (evidence of defendant's flight was admissible under both Rule 404(b) and Rule 403 as relevant evidence of defendant's guilt of the charged crime of capital murder where the State sought the death penalty); *Hyde*, 846 S.W.2d at 505 (evidence of defendant's failure to appear at first scheduled trial and his forfeiture of bond was properly admissible to show flight, and trial court did not abuse its discretion in determining that danger of unfair prejudice did not outweigh probative value of flight evidence under Rule 403).

Appellant's fourth and fifth issues should be overruled.

———————◆———————

## REPLY TO APPELLANT'S SIXTH & SEVENTH ISSUES

In two points of error, appellant complains the trial court erred in preventing him from presenting evidence during the punishment phase of trial, relevant to the mitigation special issue outlined in Article 37.071. *See* TEX. CODE CRIM. PROC. ANN. art. 37.071 § 2 (a)(1) (West 2013).

In his sixth issue, appellant complains the trial court erred in excluding bible study certificates. Appellant attempted to offer Defense Exhibit Numbers 48-55, which are bible study certificates appellant claimed he earned while in prison in Puerto Rico, through his brother, punishment witness Joel Cruz-Garcia. (RR XXVI 56-58). The defense claimed the basis for offering them was that appellant had talked to the witness about these things, "Not that the witness took the courses with him, but he's talked to him about it." Joel Cruz-Garcia testified he went to church with appellant on one occasion, but he did not indicate he possessed any personal knowledge about appellant's participation in bible study. (RR XXVI 41-42, 54).

The State objected on the basis of hearsay and defense counsel admitted the certificates were hearsay. (RR XXVI 57-58). He did not argue that any exception to the hearsay rule applied. (RR XXVI 57-58). The trial court inquired whether appellant had gotten a business record affidavit for the certificates. (RR XXVI 58). Defense counsel replied no and that he was not inclined to put appellant on the

stand just to get them into evidence. (RR XXVI 58). The trial judge ruled that while the certificates may be relevant, they were hearsay if admitted through that particular witness. (RR XXVI 58).

In his seventh issue, appellant claims the trial court prevented him from introducing evidence that he was an informant for the FBI, DEA or INS. Agent Juan DeJesus Rodriguez, who works with the police in Puerto Rico, testified he investigated the kidnappings of Andres Buten and William Martinez. (RR XXIV 43-61). During cross-examination, defense counsel wanted to inquire whether Rodriguez had learned during his investigation that appellant was a corroborating witness for the FBI, DEA or INS. (RR XXIV69-70).

The jury was taken out and defense counsel asked the witness on voir dire whether he could verify this information. (RR XXIV 70-73). Rodriguez stated he was told orally that appellant had cooperated with law enforcement in the past, but he never got confirmation in writing. (RR XXIV 72-73). There was no evidence appellant was cooperating with law enforcement in regard to the kidnapping cases in Puerto Rico. (RR XXIV 73). And Rodriguez did not provide the source of this information; thus the State objected on hearsay grounds. (RR XXIV 72-74). Defense counsel again did not argue that any hearsay exceptions applied. The judge ruled it was inadmissible hearsay at this juncture, but instructed defense counsel if he could present a witness who had personal

knowledge that appellant had previously cooperated with law enforcement, she would admit the evidence, as being relevant to mitigation. (RR XXIV 74).

The decision to admit or exclude evidence is within the discretion of the trial court. *Weatherred v. State*, 15 S.W.3d 540, 542 (Tex. Crim. App. 2000). Unless the trial judge's decision was outside the "zone of reasonable disagreement," an appellate court should uphold the ruling. *Torres v. State*, 71 S.W.3d 758, 760 (Tex. Crim. App. 2002).

Hearsay is a statement, other than one made by the declarant while testifying at trial or hearing, offered in evidence to prove the truth of the matter asserted. TEX. R. EVID. 801(d). As a general rule, hearsay evidence is inadmissible unless it falls within one of the many exceptions. TEX. R. EVID. 802. It is well-settled if the testimony fits an exception to the hearsay rule (or if the evidence was not being offered for the truth of the matter asserted) appellant, as the proponent of the evidence, had the burden of demonstrating the applicability of that exemption or exception. *Martinez v. State*, 178 S.W.3d 806, 815 (Tex. Crim. App. 2005); *see also Cofield v. State*, 891 S.W.2d 952, 954 (Tex. Crim. App. 1994) (proponent of hearsay has the burden of showing that the testimony fits within an exception to the general rule prohibiting the admission of hearsay evidence). Appellant did not provide any avenue for admissibility regarding the evidence he complains should have been admitted. *See In re E.A.K.*, 192 S.W.3d 133, 145 (Tex.

App.—Houston [14th Dist.] 2006, pet. denied) (trial court erred in admitting hearsay evidence where party failed to lay proper predicate for admission).

Relying heavily on cases from the United States Supreme Court, appellant argues that this mitigation evidence should have been admitted, despite his failure to adhere to the rules of evidence, because it is violative of his Sixth and Fourteenth Amendment's due process right to present a defense. *See Holmes v. South Carolina*, 547 U.S. 319 (2006) (exclusion of defense evidence of third-party guilt denied the defendant a fair trial); *Chambers v. Mississippi*, 410 U.S. 284 (1972) (same).

But this Court has reviewed the scenario appellant presents and ruled against him. This Court held that the United States Constitution does not require admission of mitigating evidence when it is inadmissible under state law, even when the evidence meets the test of constitutional relevancy. *See Renteria v. State* 206 S.W.3d 689, 697 (Tex. Crim. App. 2006).

Although both the United States Supreme Court and this Court have recognized that no person shall be executed without the opportunity to bring all evidence of mitigating circumstances, the United States Constitution does not require the admission of evidence if it is in a form that is objectionable. *Id.; see also Lewis v. State*, 815 S.W.2d 560, 568 (Tex. Crim. App. 1991).

The bottom line — relevant evidence must be presented in a form that is acceptable to the laws of evidence of the State in order to be received over

objection. *Id.* And this principle was re-affirmed in 2010 by this Court. *See Smith v. State*, No. AP-75793, 2010 WL 3787576 *19-23 (Tex. Crim. App. 2010) (not designated for publication).

In *Smith*, this Court evaluated a defense claim that mitigating evidence should have been admitted, despite the hearsay nature of the evidence. *See Smith*, 2010 WL 3787576 at *19-23. The trial court excluded appellant's school records and a videotape because they did not comply with the rules of evidence pertaining to business records and hearsay. *Id.* Appellant did not argue that any exception to the hearsay rule applied. *Id.* at *22.

This Court determined the trial judge did not abuse its discretion in excluding the evidence over the State's well-founded hearsay objection, holding the defendant could not rely on the fundamental protections of due process to cure the preventable error. *Smith*, 2010 WL 3787576 at *21. And the Court further opined that the United State Supreme Court's decisions in *Chambers* and *Holmes* do not alter this principle. *Id.* at *20.

This Court should similarly overrule appellant's suggestion that his constitutional right to present mitigation evidence trumps the rules of evidence. Appellant's sixth and seventh points of error should be overruled.

————————◆————————

In four points of error, appellant complains the trial court erred by allowing the prosecutor to present improper closing argument during both phases of trial. The eighth and ninth points of error address closing argument during the guilt phase; the tenth and eleventh points of error address closing argument during the punishment phase.

The Court of Criminal Appeals has determined that proper jury argument generally falls within one of four areas: 1) summation of the evidence, 2) reasonable deduction from the evidence, 3) answer to an argument of opposing counsel, and 4) plea for law enforcement. *Brown v. State*, 270 S.W.3d 564, 570 (Tex. Crim. App. 2008). A prosecutor may not use closing arguments to present evidence that is outside the record. *Freeman v. State*, 340 S.W.3d 717, 728 (Tex. Crim. App. 2011). Improper references to facts that are neither in evidence nor inferable from the evidence are generally designed to arouse the passion and prejudice of the jury and, as such, are inappropriate. *Borjan v. State*, 787 S.W.2d 53, 57 (Tex. Crim. App. 1990).

## Eighth & Ninth Points of Error

In his eighth issue, appellant complains the prosecutor engaged in improper argument when she injected facts outside the record during the guilt phase of trial. Appellant specifically complains of this passage:

> PROSECUTOR: Let me give you another example, another example of half the story. The SANE nurse. She came here and she said: Well,

there were no injuries. Wow, that must mean Obel Cruz-Garcia is guilty — is not guilty of capital murder according to the defense attorneys. No. Let's talk about what else the SANE nurse said. And I want to say she said 95 percent — it was a very high percentage — of rape cases that she does SANE nurse examinations on —

DEFENSE ATTORNEY: Objection. Outside the record.

PROSECUTOR: — do not have any injuries.

THE COURT: Overruled. But I will remind the jury that you recall the testimony from the witness stand and that is — that will be your guide in your deliberations. Arguments of counsel is not evidence. (sic) (RR XXIII 80).

SANE nurse Gloria Kologinczok testified she performed several hundred sexual assault exams during her tenure at St. Joseph's Hospital. (RR XIX 40). She performed the sexual assault exam of Diana on October 1, 1992. (RR XIX 48). She did not see any signs of physical injury or trauma during this exam. (RR XIX 48). Kologinczok testified that in most of the sexual assault exams she has performed, she did not find physical injuries. (RR XIX 48-49).

Appellant is correct that the prosecutor mischaracterized the testimony provided by the SANE nurse. There is nothing in the record to indicate Kologinczok quantified her testimony with a statistic regarding the lack of physical injuries in her examinations. Although the prosecutor's use of the high percentage could be inferable from Kologinczok's testimony that "in most cases," she sees no physical injury. (RR XIX 48-49).

44

Regardless, error during closing argument is non-constitutional in nature, and a non-constitutional error that does not affect substantial rights must be disregarded. TEX. R. APP. P. 44.2(b); *Martinez v. State*, 17 S.W.3d 677, 692–93 (Tex. Crim. App. 2000). To determine whether appellant's substantial rights were affected, this Court should balance the severity of the misconduct (i.e., the prejudicial effect), any curative measures, and the certainty of conviction absent the misconduct. *Mosley v. State*, 983 S.W.2d 249, 259 (Tex. Crim. App. 1998).

Viewing the State's closing argument as a whole, this comment does not appear to be a willful and calculated effort to deprive appellant of a fair and impartial trial. The prosecutor's comment was a very small portion of her entire closing argument at the guilt phase. (RR XXIII 80). She did not emphasize the comment and immediately moved on after the objection. (RR XXIII 81). Further, viewing the record as a whole, appellant does not appear to have been prejudiced by the comment, as the SANE nurse did testify she rarely sees physical injuries.

While the trial court did sua sponte remind the jury that closing arguments were not evidence, there was no curative instruction. *See Freeman*, 340 S.W.3d at 728-729 (although not a curative instruction, court's reminder to jury that argument was not evidence weighed in favor of harmless error). The evidence presented during the guilt phase demonstrated appellant was man who raped Diana, kidnapped Adam and ordered his death. Given the brevity of the

45

prosecutor's comment, the lack of prejudice, and the strength of the evidence supporting appellant's conviction, any error associated with this comment was harmless. *Freeman*, 340 S.W.3d at 728-729. Appellant's eighth issue should be overruled.

In his ninth issue, appellant complains the prosecutor improperly injected her personal beliefs regarding appellant's guilt as a party during closing argument in the guilt phase of trial. Appellant specifically complains about a comment the prosecutor made after going through the party language in the charge:

> PROSECUTOR: We ask you to find him guilty as a party because what we believed happened is the defendant directed and encouraged—
>
> DEFENSE ATTORNEY: Objection to putting beliefs into the argument, Your Honor. It's improper.
>
> THE COURT: That will be overruled.
>
> PROSECUTOR: What the evidence supports is that the defendant directed and encouraged Roger to kill the little boy. (RR XXIII 92).

Appellant complains the State's argument went outside the record and invited the jury to consider the prosecutor's opinion. A prosecutor may not inject her personal opinion in statements to the jury or imply a special expertise about a contested factual matter. *Johnson v. State*, 698 S.W.2d 154, 167 (Tex. Crim. App. 1985). But it is well settled that the prosecutor may argue her opinion concerning issues in the case so long as the opinion is based on the evidence in the record and

46

does not constitute unsworn testimony. *McKay v. State*, 707 S.W.2d 23, 37 (Tex. Crim. App. 1985). And a prosecutor has some leeway to respond to particular points made in defense counsel's closing. *Wesbrook v. State*, 29 S.W.3d 103, 115 (Tex. Crim. App. 2000).

Prior to this comment, defense counsel in closing argument stated, "And I have to tell you, I don't know what happened. I wasn't there. The State wasn't there. You weren't there. It's a tough decision to try to reconstruct beyond a reasonable doubt what happened." (RR XXIII 63). The prosecutor's comment was clearly a response to this argument and was the prosecutor's opinion of the evidence presented in the trial. The prosecutor did not claim to possess any special expertise of knowledge outside of the record. Therefore, the trial court did not err in overruling appellant's objection. *See McKay*, 707 S.W.2d at 37 (prosecutor's opinion of the evidence was not improper since the prosecutor didn't argue possession of any special expertise constituting unsworn testimony); *see also Wilson v. State*, 938 S.W.2d 57, 60 (Tex. Crim. App. 1996) (the invited argument rule permits prosecutorial argument outside the record in response to defense argument which goes outside the record).

Even assuming the comment was error, it was harmless because it did not affect appellant's substantial rights. TEX. R. APP. P. 44.2(b); *Mosley*, 983 S.W.2d at 259 (factors to consider include the severity of the misconduct, any curative

measures and the certainty of conviction absent the misconduct). When the prosecutor stated what she thought happened that night, she was in essence telling the jury the State's theory of the case with regard to party liability.[3] Although there was no curative instruction, the prosecutor immediately re-phrased her argument, "What the evidence supports is that the defendant directed and encouraged Roger to kill the little boy." (RR XXIII 92). *See Zarate v. State*, 908 S.W.2d 544, 549-550 (Tex. App.—Fort Worth 1995, pet. ref'd) (prosecutor's references in closing argument regarding her personal opinion were harmless because she immediately abandoned the line of reasoning when an objection was made).

It is unlikely the use of the words "we believe" in this isolated instance influenced the jury in such a manner to question appellant's conviction, based upon the wealth of evidence supporting his guilt. *See Allen v. State*, 149 S.W.3d 254, 261 (Tex. App.—Fort Worth 2004, pet. ref'd) (prosecutor's improper act of injecting his personal opinion during closing argument was harmless where evidence of defendant's guilt was ample).

Appellant's ninth issue should be overruled.

---

[3] It is common for practitioners to use terms like "I believe, we believe" and inadvertently provide their opinion when they are really just summarizing the evidence. Defense counsel did it twice during closing argument at the punishment phase. (RR XXVI 116, 130).

## Tenth & Eleventh Points of Error

In his tenth issue, appellant similarly complains the prosecutor went outside the record and injected her personal belief during her closing argument in the punishment phase. The prosecutor summarized the evidence demonstrating appellant ordered Aviles-Barroso (Roger) to kill Adam:

> PROSECUTOR: Who is orchestrating this deal? Who is orchestrating all the criminal conduct that he's involved in from all of the evidence that you've heard? Him. He is the boss. And that's why when he told Roger to stab that little boy, he did. And Roger will pay the price for that when his turn comes, but don't take the blame off of the man who told him to do it. Don't excuse him. *Because I will tell you right now, if it were up to Roger alone, Angelo would still be alive.* (RR XXVI 163-164) (emphasis added).

Defense counsel objected the last line of that passage was outside of the record. (RR XXVI 164-165). The trial court overruled his objection but instructed the prosecutor to clear up her argument. (RR XXVI 165). The prosecutor complied:

> PROSECUTOR: What I'm saying to you is, is that the defendant was the boss. The defendant told Roger to kill the little boy... And without hesitation, he got out of the car and opened the door and he told Roger in Spanish: You know what you have to do. And guess what? Roger did it. (RR XXVI 165-166).

Appellant's tenth point of error is waived. To complain on appeal about improper jury argument, appellant must "show that he objected and pursued his objection to an adverse ruling." *Cockrell v. State*, 933 S.W.2d 73, 89 (Tex. Crim. App. 1996). Prior to the passage appellant complains of in his tenth point of error, the

49

other prosecutor made virtually the same argument during closing argument and appellant failed to object.

> PROSECUTOR: You can answer based on what you know in the facts and evidence that Obel Cruz-Garcia is responsible for Angelo's death. *But for Obel Cruz-Garcia, don't you know that Angelo Garcia, Jr. would be alive. Baby Angelo would be here but for Obel Cruz-Garcia.* (RR XXVI 153) (emphasis added).

Appellant has waived this argument because he failed to object to all the alleged objectionable arguments. TEX. R. APP. P. 33.1(a); *Fuentes v. State*, 991 S.W.2d 267, 273 (Tex. Crim. App. 1999) (a defendant must object each time the impermissible argument is made, or the complaint is waived); *Wilson v. State*, 179 S.W.3d 240, 249 (Tex. App.—Texarkana 2005, no pet.) (same).

Even assuming the issue was preserved, the argument was proper as a reasonable deduction from the evidence. Counsel is allowed wide latitude in drawing inferences from evidence so long as they are reasonable, fair, legitimate and offered in good faith. *McFarland v. State*, 845 S.W.2d 824, 840 (Tex. Crim. App. 1992). Further, even if the prosecutor's statements could be construed as stating her opinion, a prosecutor may argue her opinions concerning issues in the case so long as the opinions are based on the evidence in the record and do not constitute unsworn testimony. *Penry v. State*, 903 S.W.2d 715, 756 (Tex. Crim. App. 1995).

The jury learned from Santana, Diana and Linda Hernandez that appellant was the leader of the drug operation and everyone took direction from him.

Evidence at trial demonstrated that appellant physically carried Adam out of the apartment that night. Santana tried to convince appellant to take Adam back inside, but he would not. There was absolutely no evidence that Santana or Aviles-Barroso wanted to kidnap or kill Adam.

Appellant choose the location for Adam's death and burial. He drove his co-conspirators and Adam to Baytown and once in a secluded area, gave the order for Aviles-Barroso to kill Adam. Appellant directed Santana and Aviles-Barroso to put Adam's body back in the car, and he drove to another rural area and instructed them to submerge Adam's body in the river.

The evidence revealed not only was appellant the leader of the drug ring, he orchestrated the burglary, as well as Adam's kidnapping and murder. The prosecutor's argument — that appellant is the reason Adam is dead — whether a reasonable deduction of the evidence or the prosecutor's opinion of the evidence, was not improper. *See Garcia v. State*, 246 S.W.3d 121, 145 (Tex. App.—San Antonio 2007, pet. ref'd) (prosecutor's statement regarding personal belief of guilt was based upon the evidence and thus, not improper); *Carlock v. State*, 8 S.W.3d 717, 725-726 (Tex. App.—Waco 1999, pet. ref'd) (prosecution's arguments were properly based on reasonable deductions from evidence and did not improperly invite jury to speculate). Appellant's tenth point of error should be overruled.

In his eleventh issue, appellant complains the trial court erred by denying his motion for mistrial based upon improper jury argument during the punishment phase.

> PROSECUTOR: What else? They want to minimize the escape attempt. Justin talked to you about that. What do you think happened after he attempted to escape? You think he might have wound up in administrative segregation. I bet he did. (RR XXVI 171).

The defense attorney objected this was outside the record and the trial court agreed. (RR XXVI 171-172). The trial judge sustained the objection and instructed the jury to disregard the last statement made by the prosecutor. (RR XXVI 171-172). Appellant moved for a mistrial which was denied. (RR XXVI 172).

A mistrial is the trial court's remedy for improper conduct that is "so prejudicial that expenditure of further time and expense would be wasteful and futile." *Hawkins v. State*, 135 S.W.3d 72, 76 (Tex. Crim. App. 2004). Only in extreme circumstances, where the prejudice is incurable, will a mistrial be required. *Id.* at 77. When the trial court sustains an objection and grants an instruction to disregard, but denies the motion for mistrial, the proper issue to address is whether the refusal to grant the mistrial was an abuse of discretion on the part of the trial court. *Id.* at 76-77. The question of whether a mistrial for improper argument should have been granted involves most, if not all, of the same considerations that attend a harm analysis. *Id.* at 77.

In determining whether improper jury argument warrants a mistrial, three factors should be evaluated: 1) severity of the misconduct (the magnitude of the prejudicial effect of the prosecutor's remarks); 2) measures adopted to cure the misconduct (the efficacy of any cautionary instruction by the judge); and 3) the certainty of conviction absent the misconduct (the strength of the evidence supporting the conviction). *Ramon v. State*, 159 S.W.3d 927, 929 (Tex. Crim. App. 2004), *citing Mosley*, 983 S.W.2d at 259. Since the argument occurred at punishment, this Court analyzes the third factor with regard to the certainty of the punishment assessed. *Martinez*, 17 S.W.3d at 693.

An officer from the Department of Corrections and Correctional Institution of Guayama, Puerto Rico testified about appellant's escape attempt while he was incarcerated on October 10, 2003. (RR XXIV 118-128). He mentioned that afterward, during the investigation of the escape attempt, appellant was interviewed, and after he provided no information, the classification committee determined his punishment would be another type of custody. (RR XXIV 128). When appellant was booked into the Harris County Jail on February 12, 2010, he was place into administrative segregation, as a high-risk inmate. (RR XXV 145).

The complained-of passage was a small part of the prosecutor's closing argument. The comment likely had little or no prejudicial effect. The jury was aware of appellant's escape attempt and inmate classification. The only possible

new fact was whether he had been punished for the escape attempt. With regard to curative measures, the trial judge sustained appellant's objection and gave a prompt curative instruction telling the jury to disregard the State's remark. *See Ladd v. State*, 3 S.W.3d 547, 567 (Tex. Crim. App. 1999) (the appellate court should presume the jury followed the instruction to disregard).

In support of special issue number 1 — whether appellant would commit criminal acts of violence that would constitute a continuing threat to society — the State presented evidence that appellant committed several other violent crimes, including the murder of Saul Flores, the attempted murder of Manuel Buten, the aggravated kidnapping of Andres Buten, the aggravated kidnapping of William Martinez, the burglary and assault of Patiko as well as the sexual assault of his girlfriend. In light of this powerful evidence, it is unlikely a comment regarding appellant's punishment for an escape attempt affected the jury's certainty on the punishment of death.

Given the brevity of the prosecutor's comment, the lack of prejudice, the curative measures, and the strength of the evidence supporting appellant's sentence, appellant has not shown the trial court abuse its discretion in denying his motion for mistrial. *See Green v. State*, No. AP-76458, 2012 WL 4673756 *33 (Tex. Crim. App. 2012) (not designated for publication) (trial court did not abuse its discretion in denying defendant's motion for mistrial based on the prosecutor's

improper remarks during closing argument regarding the defendant's prison disciplinary problems that were outside the record in the punishment phase of a capital murder death case, noting the trial court sustained defense counsel's objection to the testimony and instructed the jury to disregard the testimony).

Appellant's eleventh point of error should be overruled.

———————◆———————

## REPLY TO APPELLANT'S TWELFTH ISSUE

In his final point of error, appellant argues the trial court erred in denying his motion for new trial. (CR 569-577).

## Standard of Review

Appellant contends his motion for new trial should have been granted due to jury misconduct, specifically evidence of an outside influence during the punishment deliberations. *See* TEX. R. APP. P. 21.3; *White v. State*, 225 S.W.3d 571 (Tex. Crim. App. 2007) (setting out three grounds for jury misconduct that can potentially get a defendant a new trial: 1) deciding a verdict unfairly; 2) receiving other evidence, unauthorized conversation, or being intoxicated while deliberating; or 3) depriving the defendant of a fair trial).

Appellant complained of jury misconduct, in that one juror, Angela Bowman, felt undue pressure to return her verdict, and the jury foreman, Matthew Clinger, read Bible scriptures in the jury room, which constituted an outside

influence.  (RR XXIX 4, 12, 22-26).  In support of his allegations, appellant offered three affidavits:  one from his trial attorney Mario Madrid, defense investigator J.J. Gradoni, and jury member Angela Bowman.   (CR 569-577; RR XXXV 28-36; Defense Exhibit Numbers 1, 2 & 3).

The State responded the affidavits were not admissible under Rule 606(b), and even if they were, they did not demonstrate any conversation about the Bible unduly influenced the jury, and the State offered affidavits in response to that issue.  (RR XXIX 11-18; RR XXXV 3-9; State's Exhibit Numbers 1 & 2).

After review of appellant's motion and the affidavits, the trial court denied appellant's motion for new trial.  (RR XXIX 28).  The court admitted appellant's three affidavits into evidence, as well as two provided by the State, but noted:

> "And I find obviously by making those — by finding those affidavits are admissible that there is enough question as to whether this Bible production or Bible reading, whatever occurred, may be an outside influence.  I'm not of the opinion that it was based on everything that's been provided to me in the case law, but we're going to send it up and see if the Court of Appeals — Court of Criminal Appeals agrees with us on that.
>
> And so, based on that I'm not granting the Motion For New Trial."
> (RR XXIX 28).

This Court reviews a trial court's denial of a motion for new trial for an abuse of discretion.  *Salazar v. State*, 38 S.W.3d 141, 148 (Tex. Crim. App. 2001).  In conducting this review, this Court may not substitute its judgment for that of the trial court; rather, it should decide only whether the trial court's decision was

56

arbitrary or unreasonable. *Holden v. State*, 201 S.W.3d 761, 763 (Tex. Crim. App. 2006). A trial court abuses its discretion in denying a motion for new trial only when no reasonable view of the record could support the trial court's ruling. *Id.*

A motion for new trial alleging jury misconduct must be supported by the affidavit of a juror or other person who is in a position to know the facts. *Trout v. State*, 702 S.W.2d 618, 620 (Tex. Crim. App. 1985). Texas Rule of Evidence 606(b) prohibits post-verdict testimony about events or statements that occurred during jury deliberations, the jurors' mental processes, or how an improper influence affected the jurors. TEX. R. EVID. 606(b); *Colyer v. State*, 428 S.W.3d 117, 123 (Tex. Crim. App. 2014). It also prohibits such evidence by affidavit. *Id.* at 124. An outside influence about which a juror may testify includes a discussion originating from a source outside of the jury room and other than from the jurors themselves. *McQuarrie v. State*, 380 S.W.3d 145, 154 (Tex. Crim. App. 2012).

<u>Motion For New Trial Evidence</u>

On July 19, 2013, the jury was in the second day of punishment deliberations. (RR XXVI 176-178; RR XXVII 3-14). At approximately 3:20 p.m., jury member Angela Bowman sent a note asking to speak to the trial judge. (CR 512). The trial judge allowed this jury member to speak to her in the privacy of her chambers, within the presence of the court reporter. (RR XXVII 3-4).

When the trial judge asked Bowman what she needed to relay to the court, Bowman replied that she could not agree with other jurors on the special issues and felt pressured. (RR XXVII 4-5). Bowman urged the judge to allow an alternate to take her place. (RR XXVII 5). The judge educated Bowman on the law in this regard, and Bowman replied that the jury was never going to come to an agreement. (RR XXVII 6). Bowman also stated that she did not want to have to stay another night. (RR XXVII 8). The judge instructed her to resume her deliberations with the jury until otherwise directed by the court. (RR XXVII 6-8). Bowman returned to the jury room and the jury returned its punishment verdict on all three special issues at approximately 4:30 p.m. (CR 523-527).

One of appellant's trial attorneys, Mario Madrid, provided an affidavit where he summarized a conversation he had with Bowman later that night. (Defense Exhibit Number 1). He stated Bowman was distraught over the punishment deliberations and claimed she was pressured into changing her decision. *Id.* She explained her decision was complicated by the fact that her daughter was ill and she was unable to attend to her due to sequestration. *Id.* Bowman also stated the jury foreman quoted from his Bible during the deliberations, and she felt it influenced other jurors. *Id.*

Angela Bowman provided an affidavit as well and expanded on what she initially told the trial judge and Mario Madrid. (Defense Exhibit Number 3).

58

Bowman claimed she received a phone call from her daughter's camp counselor on the first day of deliberations, July 18, 2013. *Id.* In her affidavit, she claims her daughter had a fever and stated, "If it had not been for my concern over my daughter's health condition, I would have remained committed to voting for life in prison." *Id.* She also noted that the jury foreman took out his Bible when another juror, Casey Guillotte, sought spiritual guidance to make her decision. *Id.* Bowman did not claim the act of referencing the Bible caused her to change her decision, she was clear, "I changed my verdict so I could go home and take care of my child." *Id.*

The defense also submitted an affidavit from their investigator, J.J. Gradoni. (Defense Exhibit Number 2). His statement substantiates much of what was included in the affidavits provided by Mario Madrid and Angela Bowman. *Id.* He also added that he interviewed the jury foreman, Matthew Clinger, who admitted he pulled out his personal Bible during deliberations and read from it. *Id.* Clinger shared the fact that he looked to his Bible for spiritual guidance with Casey Guillotte. *Id.*

The State presented two affidavits in its response to appellant's motion for new trial, in the alternative, if the trial court ruled the affidavits were admissible under Rule 609(b). (RR XXIX 11).

The first was from Casey Guillotte.  (States' Exhibit Number 1).  She stated the jury came back on the first two special issues unanimously, then turned to the third special issue—whether there was sufficient mitigation evidence to warrant life in prison rather than the death penalty.  *Id.* She said at this point, she asked the entire jury about how each of them would come to terms with the verdict, from an emotional standpoint.  *Id.*  Guillotte stated in response to her question, Clinger retrieved his personal Bible from his belongings and read a passage to himself.  *Id.* He told her he found comfort with his decision because of a verse in the book of Romans.  *Id.*  She stated Clinger did not read the Bible to the jury or direct any of them to a particular passage, and it not influence her decision.  *Id.*

The State also presented an affidavit from Matthew Clinger, the jury foreman.  (State's Exhibit Number 2).  He recalled when deciding the three special issues, the jury agreed to focus their discussions on the facts and not emotions.  *Id.* Clinger remembered that Casey Guillotte, while staying true to this intention, wondered aloud how they would all deal with the aftermath of their verdict.  *Id.* Several of the jurors shared how they dealt with their emotions and he told Guillotte he found comfort in the Bible.  *Id.* Although he pulled out his Bible for himself, he did not read from it aloud, nor did Guillotte read it.  *Id.* He characterized the conversation as sharing advice for coping with the emotional ramifications of their decision.  *Id.*

<u>Analysis</u>

The record reveals the trial court admitted the affidavits in an abundance of caution, but held the belief the affidavits were not admissible under Rule 606(b). The judge specifically stated that she did not think a Bible production or Bible reading (which ever occurred) constituted an "outside influence." (RR XXIX 28). This is legally correct based on the facts of this case.

This Court has considered the term "outside influence" when evaluating whether evidence from jurors is admissible in a motion for new trial under Rule 606(b). In 2012, this Court decided *McQuarrie v. State*; the defendant in that case was charged with sexual assault and he maintained it was consensual sex, although the victim claimed she was drugged. *McQuarrie*, 380 S.W.3d at 147-148, 150-155. After one day of deliberating, the jury was unable to reach a unanimous verdict, so they resumed deliberations the following day. *Id.* at 148. The next day, one of the jurors shared information with the rest of the jury concerning internet research he performed the night before, on the effects of date rape drugs, pertinent to the case. *Id.* In holding the internet research qualified as an outside influence for which the defendant should have been permitted to conduct a post-trial inquiry, this Court stated, "A Rule 606(b) inquiry is limited to that which occurs outside the jury room and outside of the juror's personal knowledge and experience." *Id.* at 153.

In 2014, this Court clarified that personal pressures—such as fear of inclement weather or concern about a child's illness—are not "outside influences under Rule 606(b). *See Colyer*, 428 S.W.3d at 119. Juror testimony on these subjects is not admissible to show jury misconduct. *Id.* at 127-128 (rejecting defense contention that weather and a call from child's doctor constitute information outside the jury room, since these are influences unrelated to the trial issues); *compare McQuarrie*, 380 S.W.3d at 154-155.

A collective reading of this authority demonstrates why the affidavits in this case are not admissible to show an "outside influence" under Rule 606(b). (CR 12). First, Bowman never asserted the bible reading affected her decision. She claimed the stress over her daughter's illness caused her to change her vote. This falls squarely within the holding of *Colyer* and her affidavit should not be admissible in support of appellant's new trial. *See Colyer*, 428 S.W.3d at 127-128 (rejecting defendant's interpretation of "outside influence," which could include a juror that has second thoughts about his vote and then retroactively claim that a personal pressure, such as his job, marriage, or children, made him apprehensive and eager to conclude the deliberations).

And the religious conversation in the jury room was characterized as one of comfort, from one jury member to another, on dealing with the emotions of participating in this trial and assessing a difficult punishment. The foreman did

not read the Bible out loud to the jury, but to himself. It was not a source of new evidence pertaining to the issues in this case, as in *McQuarrie.* It was the foreman's personal belief that he shared during deliberations, which is not a permissible challenge to the verdict. *See Hines v. State*, 3 S.W.3d 618, 623 (Tex. App.—Texarkana 1999, pet. ref'd) (a juror's injection of his own personal experiences, knowledge, or expertise is not considered an "outside influence," because those representations emanate from inside the jury). And even assuming the record demonstrated the foreman was using his religious beliefs to coerce other jurors, it does not constitute an "outside influence." *Id.* (coercive influence of one juror on the rest of the panel does not constitute an "outside influence").

Therefore, the defense affidavits relating to this incident are not admissible under Rule 606(b) to support his motion for new trial. *Compare Oliver v. Quaterman*, 541 F.3d 329, 340 (5th 2008) (jury's Bible consultation as a group constituted an external influence on deliberations where the jury did not simply discuss their own understanding of religious law and morality or merely quote the Bible, but instead compared the facts of their case to a specific passage in the Bible that taught capital punishment was appropriate for murder).

Even assuming the affidavits are admissible in this case, appellant has not shown the trial court abused its discretion in denying his motion for new trial. In 2008, this Court decided *Lucero v. State*; the defendant in that case was charged

with capital murder and claimed on appeal he was entitled to a new trial because the jury foreman read scripture from the Bible during punishment deliberations. *Lucero v. State*, 246 S.W.3d 86 (Tex. Crim. App. 2008). Evidence in that case revealed that the jury foreman read a passage from the Bible that lasted approximately 2-3 minutes during the hours-long deliberations. *Id.* at 92. This Court declined to decide whether the jury foreman's reading of the Bible was an "outside influence," and denied the defendant's motion for new trial because the affidavits were devoid of any evidence that the scripture reading affected the jury's punishment verdict of death. *Id.* at 95.

The affidavits in this case similarly contain no evidence that references to the Bible affected any juror's punishment decision.[4] (State's Exhibit Number 1; Defense Exhibit Number 3). Thus, appellant has not shown he should have been granted a new trial, even when considering this evidence. *See Oliver*, 541 F.3d at 341-344 (jury's decision to impose the death penalty, despite the fact they consulted an external influence, was harmless due to evidence from the jurors that it did not prejudice their decision).

---

[4] Appellant also claims the trial court erred by not having a hearing on his motion. (Appellant's brief 114-115). The defense was asked specifically about any other evidence that would show a juror was influenced by the bible reference, and he acknowledged there was nothing more than the affidavits presented. (RR XXIX 24). *Lucero* is instructive on this issue, finding the lack of evidence from any juror showing the bible reading affected their verdict supported the trial court's decision not to hold a hearing. *Lucero*, 246 S.W.3d at 94-95; *see also Wallace v. State*, 106 S.W.3d 103, 108 (Tex. Crim. App. 2003) (defendant is entitled to an evidentiary hearing on his motion for new trial if the motion and accompanying affidavits raise matters not determinable from the record, upon which the accused would be entitled to relief).

Appellant's twelfth point of error should be overruled. *See* TEX. R. APP. P. 21.3; *Tate v. State*, 414 S.W.3d 260, 264 (Tex. App.—Houston [1st Dist.] 2013, no pet.) (mere showing of outside influence, by jury's foreman research of defendant's criminal history, was insufficient to establish juror misconduct, where the record contained no evidence that this knowledge affected the jury's decision).

———————————◆———————————

## CONCLUSION

It is respectfully submitted that this Court affirm appellant's conviction and sentence.

DEVON ANDERSON
District Attorney
Harris County, Texas

/s/ *Jessica Akins*

JESSICA AKINS
Assistant District Attorney
Harris County, Texas
1201 Franklin, Suite 600
Houston, Texas 77002
(713) 755-5826
TBC No. 24029415
akins_jessica@dao.hctx.net

## CERTIFICATE OF SERVICE

This is to certify that a copy of the foregoing instrument has been mailed to the following address:

Wayne T. Hill
Attorney at Law
4615 Southwest Frwy, Suite 600
Houston, Texas 77027
wthlaw@aol.com

Lisa McMinn
State Prosecuting Attorney
P.O. Box 13046
Austin, Texas 78711
Lisa.McMinn@SPA.texas.gov

/s/ *Jessica Akins*

JESSICA AKINS
Assistant District Attorney
Harris County, Texas
1201 Franklin, Suite 600
Houston, Texas 77002
(713) 755-5826
TBC No. 24029415
akins_jessica@dao.hctx.net

## CERTIFICATE OF COMPLIANCE

This is to certify that this computer-generated document has a word count of 16,843 words, based upon the representation provided by the word processing program that was used to create the document.

/s/ *Jessica Akins*

JESSICA AKINS
Assistant District Attorney
Harris County, Texas

Date: 4/15/2015